THE JOSEPH FARWELL.

EDWARDS and others v. THE JOSEPH FARWELL and Cargo.

(*District Court, S. D. Alabama.* June 6, 1887.)

1. SHIPPING—GENERAL AVERAGE—REPAIRS.
   When a vessel, disabled at sea, puts into a port of refuge for repairs, the
   ordinary expenses incurred, including pilotage, towage, quarantine dues, dock-
   ing, wharfage, surveys on the ship and cargo, cost of unloading, storing, and
   reloading cargo, and an allowance for wages of the crew, and provisions from
   the moment of departure from the course of the voyage until its renewal, or
   so long as its renewal remains in expectancy, are chargeable to general average.
2. SAME—CARGO.
   Where the interests are temporarily separated, as by unloading and storing
   the cargo in order to repair the vessel, and it is expected to reload the cargo,
   and complete the voyage, then, even though by reason of unforeseen circum-
   stances, as the inability to repair the vessel and make her seaworthy again,
   this expectation is not realized, the entire expenses of saving and protecting
   the different interests, until the hope of reuniting them is abandoned, are
   chargeable to general average.
3. SAME—ABANDONMENT OF VOYAGE.
   The cost and expenses incident to repairs to the vessel, incurred in the ex-
   pectation of continuing the voyage, are not chargeable to general average,
   when the voyage is subsequently abandoned.
4. SAME—FREIGHT.
   Freight *pro rata itineris* is not earned where, from necessity, cargo is ac-
   cepted before arrival at the port of destination; accordingly there is no con-
   tribution on freight.

In Admiralty. Libels for general average. The facts sufficiently ap-
pear from the opinion.

*J. L. & T. H. Smith,* for libelants Edwards and others.

*Smith & Gaynor,* for master and crew and material-men.

*L. H. Faith,* for material-men.

*Peter & Thos. A. Hamilton,* for claimants of cargo.

TOULMIN, J. When a vessel is disabled at sea, and puts into a port
of refuge for repair, the ordinary expenses incurred are regarded as gen-
eral average. A general average contribution is a division of the loss or
expense among those benefited, and has its foundation in equity and
natural justice. General average expenses include the charges of enter-
ing the harbor, as pilotage, towage, quarantine dues, docking, wharfage,

surveys on the ship and cargo, cost of unloading, storing, and reloading cargo, and an allowance for wages of the crew, and provisions from the moment of departure from the course of the voyage until the voyage is renewed, or until it is abandoned, and the interests separated. But these expenses of the delay are general average only up to the time the continuation of the voyage remains in expectancy. When there is no longer any fair expectation of a continuance of the voyage, it is considered as broken up, and there are no longer any general average expenses. Where the interests are temporarily separated as a means towards an end, and it is expected to reload the cargo and complete the voyage, then, even though by reason of unforeseen circumstances this expectation is not realized, the entire expenses of saving the different interests, and protecting them until the hope of reuniting them is abandoned, are general average; the general rule being that when a cargo continues under the control of the master, so that it may be taken on board for the purpose of prosecuting the voyage, the common interest remains up to the time the voyage is or may be resumed. If the voyage is not abandoned, and the cargo, although separated and removed from the ship, is still under the control of the master, and liable to be taken again on board for the purpose of being carried to its destined port, the relations of the several owners are in no respect changed. The common interest remains, and whatever is done for the common interest must be done at the common expense.

I find these principles well settled by the authorities, and by them I must be guided in reaching my conclusions in this case. And there is another principle equally as well settled, and that is that when expenses are incurred for the benefit of the ship alone, or for the whole or a part of the cargo only, they must be borne by the thing for whose benefit they were incurred. See 1 Pritch. Adm. Dig. 80, and notes; *Padelford* v. *Boardman*, 4 Mass. 548; *The Star of Hope*, 9 Wall. 203; *Hobson* v. *Lord*, 92 U. S. 397; *McAndrews* v. *Thatcher*, 3 Wall. 367; *Nelson* v. *Belmont*, 21 N. Y. 36; *The Mary*, 1 Spr. 17; *Williams* v. *Suffolk Ins. Co.*, 3 Sum. 510.

The schooner Joseph Farwell, being on a voyage from Laguna, Mexico, to the port of New York, in the United States, with a cargo of sundries on board consigned to certain mercantile firms in New York, encountered a very severe storm, by which she and her cargo was so damaged and injured that she could not complete her voyage without supplies and repairs. Under these circumstances, and with the hope of benefit to the vessel, her freight and cargo, the master bore away to the port of Mobile to refit the vessel, and to procure the necessary repairs for her to enable her to perform the intended voyage, and to safely carry the cargo to its place of destination. The vessel bore away on the eleventh day of October, 1886, and arrived in the port of Mobile on the fifteenth of that month, where, upon inspection and survey, it was found necessary to unload and care for the cargo, and to dock the vessel, that she might receive the necessary repairs. The vessel and cargo were insured, and this was known to the master. He hoped that temporary repairs on the vessel would enable him to proceed on and complete his voyage

with the cargo in safety; but the surveyors found and reported that it could not be done; that the vessel was not seaworthy; and that general repairs were necessary to make her so.

The community of extraordinary peril commenced with the accident to the vessel, but the question is, when did it terminate? Owing to circumstances which seem to have been unavoidable, there was considerable delay in getting the vessel docked and in a condition to have the repairs made on her, and from the reports made by the surveyors it was apparent that the extent of repairs required would consume much time, and would cost a large sum of money,—greatly more than the value of the vessel. In this view of the case, I was at first inclined to hold that the only expenses chargeable to general average were such as were incurred from the time of the departure from the course of the voyage to the time when the surveys and report were made, on the principle, as I find it laid down in the books, that when an accident happens to a ship, and she is disabled, and puts into a port of refuge for repairs, if the repairs would last nearly as long or cost almost as much as building another vessel, the master should charter another vessel, and tranship the cargo. 1 Pritch. Adm. Dig. 626; 1 Pars. Ship. & Adm. 235, 336.

Ordinarily, when a ship is disabled, the master has the right to hold on to the cargo while repairing the ship; but there is a limit to this right. The question is one of reasonable delay. The master has a right to retain the cargo if he can refit his own ship in a *reasonable* time. But where the vessel cannot be refitted in a reasonable time, and other transportation is accessible, the master has no right to hold on to the cargo, and repair. *McGaw* v. *Ocean Ins. Co.*, 23 Pick. 405; *Clark* v. *Massachusetts, F. & M. Ins. Co.*, 2 Pick. 105; Phil. Ins. § 1142. But, on further consideration of this case, my conclusion is that the liability of general average continued until the voyage can be fairly considered as having broken up, and this was when there was no longer any reasonable expectation of its being continued. The cargo was liable to contribute for any general average or expenses incurred as long as it was "at risk." Physical destruction or direct physical injury to the cargo was not the only risk to which it was exposed. Its value depended, at least is supposed to have depended, in some degree, upon the successful prosecution of the voyage. Until that was broken up, the cargo, although it was separated from the ship, and put in a place of present safety, was not so completely separated from the ship and from the whole adventure as to leave no community of interest remaining. It was not entirely disconnected with the enterprise, and it must be regarded as still "at risk," and liable to contribute, if it was still under the control of the master, and liable to be taken again on board for the purpose of being carried to its destined port. *McAndrews* v. *Thatcher*, 3 Wall. 347; *Nelson* v. *Belmont*, 21 N. Y. 36.

I presume that there is not a doubt entertained that if the master had been successful in having the necessary repairs made in a reasonable time, and had resumed his voyage, and safely delivered the cargo in the port of destination, the whole expense of the delay in the voyage would

have been regarded as a general average adventure. But the suggestion is made that the cargo was separated from the ship, and that after this nothing was done for the common benefit of ship and cargo. It is answered that the cargo was unloaded for the purpose of repairing the vessel, to enable her to prosecute her voyage to its termination with the cargo, and thereby save the whole adventure; that it was still under the control of the master, and liable to be taken on board again. If this was so, the transaction was not necessarily divested of its character as an act for the benefit of the ship and cargo until the voyage was abandoned, or is considered as having broken up. The complete separation of the ship and cargo does dissolve the community of interest, and puts an end to any further general charges. *The Ann D. Richardson*, Abb. Adm. 501.

Such separation became complete in this case when the voyage was broken up and abandoned, and, in my opinion, that was when the owner failed to raise the money to complete the repairs, left the vessel and master in this port without means, and returned to New York. Up to this time the master had some reason to believe that the voyage might be resumed. The owner was present, giving his personal attention to the matter. Considerable sums of money and supplies had been furnished the master to enable him to refit his vessel, and continue his voyage, and I think the circumstances show he believed, and had up to that time reason to believe, the repairs could be completed and the vessel despatched in a short time. But when Wylie, Fisk & Co. refused to advance any more money, and the owner gave up and left, I think all reasonable expectations ended. It should have ended then. This was on the twenty-eighth of December, 1886. Though a large sum had been expended, the repairs on the vessel were not complete, and they were suspended for want of funds. In less than a month thereafter the vessel and cargo were libeled for expenses incurred and money advanced on their account.

The evidence is satisfactory that the master acted throughout in good faith, and there is no ground to believe he was wanting in personal energy or nautical skill; but my opinion is, he, in some respects, showed a great want of good judgment, and acted very injudiciously, in regard to the interests of both the ship and cargo. If he had acted wisely, and with a due regard to the interests of all concerned, he would have transhipped the cargo as soon as he found the condition of the vessel was such as to entail great expense and delay in repairing her; thus saving extraordinary expenses to the owners of the cargo, and at the same time earning freight for the owner of the ship. Then, again, he would not have discharged a part of his crew on arrival in the port of Mobile, and employed other men to take their places at much larger wages, and that, too, when it appears by his shipping articles the term of service of the crew had not expired and would not expire for three months. Besides this, the evidence fails to satisfy me of the necessity of a full crew during the time the vessel was on the ways, and actually undergoing repairs there. The master, I know, has a large discretion in these matters, but

he is bound, in acting as agent for ship and cargo, to consult, so far as he can, the true interests of both. His acts as agent in the matters referred to were not, in my judgment, reasonably judicious, and were not for the best interests of all concerned. The expenses incurred by him must have been necessary and reasonable, for such only are general average charges. After the cargo is in safety, the benefit it may derive from being carried in the ship to its place of destination is not a ground for making it contribute towards the cost of repairing the ship, nor of placing her in a position in which she can be repaired. 1 Pritch. Adm. Dig. 92, and note, Lown. Av. (3d Ed.) 3.

The cost of the repairs on the vessel is not chargeable in this case to general average, nor are the expenses incident to such repairs so chargeable; and there is no freight that can be made liable to contribute to the general average expenses. The delivery of the cargo at the port of destination is a condition precedent to the right to freight. *The Ann D. Richardson*, Abb. Adm. 499; 1 Pritch. Adm. Dig. 581, and note, 146; *Scott v. Libby*, 2 Johns. 336; *Adams v. Haught*, 14 Tex. 243.

Freight, *pro rata itineris*, is not due where there has been an acceptance by the owner of the cargo from necessity. *The Nathaniel Hooper*, 3 Sum. 543; *McGaw v. Ocean Ins. Co.*, 23 Pick. 405.

There being, then, no freight earned, there is none to contribute.

I find the value of the cargo to be $10,000, and the value of the vessel in this port, before any repairs were put on her, $1,000. My judgment is that the expenses incurred in entering this port shall be charged to general average. They include pilotage, towage, quarantine dues, three surveys on the ship and cargo, the expense of docking the ship for the purpose of surveys, cost of unloading and storing cargo, and the wages of the crew, and provisions from the time of departure from the course of the voyage, on October 11, 1886, down to December 28, 1886, and the wages of the master from October 11, 1886, to January 20, 1887, when the vessel and cargo were taken from his possession by the seizure of the marshal. The shipping articles show the number of the crew, and the amount of their respective wages. All other claims filed, and not specifically mentioned herein, are allowed as charges against the vessel and owners.

It is ordered that it be referred to Richard Jones, the clerk of this court, as special referee and adjuster, to ascertain and report from the evidence already before the court the amounts respectively due the libelants and petitioners whose claims have been allowed; to ascertain and report the apportionment of general average, and to adjust the same; and also to ascertain and report the amounts due by the vessel and owners alone, —all in accordance with the principles announced and views expressed in the opinion herewith submitted.