## THE STRATHDON.

### (District Court, E. D. New York.   July 22, 1898.)

1. SHIPPING—LIABILITY OF SHIP OWNERS—INJURY TO CARGO BY FIRE.
    Sugar in baskets, placed on plank on the iron floor of the between-decks of a steamship, was ignited by the heat of the flue of the donkey boiler in the stokehole bulkhead immediately beneath it.   The top of the flue was 18 inches from the floor of the between-decks, and intervening was a system of baffle plates.   The ship and her machinery were constructed by competent builders, under the survey of Lloyds' Register, from whom she had received the highest rank for hull and machinery. She had been for three and one-half years in active and varied service, had been repeatedly surveyed, and numerous experts testified that her plan was in accordance with the known and practiced devices for safety, while there was no evidence of other or better systems of protection against fire.   *Held*, that the fire was not caused by the design or neglect of the ship owners, and that, under Rev. St. § 4282, such owners were not liable for the cargo injured or destroyed by the fire.

2. SAME—PROXIMATE CAUSE OF INJURY.
    During the flooding of the hold to extinguish the fire, the ship grounded in the Suez Canal, and listed, so as to allow water to flow through a pipe without a stop valve, leading from the bathroom of the captain's cabin, and to find its way into one of the holds.   *Held*, that the fire was the proximate cause of the injury to the cargo in such hold, and that the ship owners were not liable therefor.

3. SAME — DELAY OF VESSEL FOR REPAIRS — DECLINE IN MARKET VALUE OF CARGO.
    The ship was delayed necessarily for six months for repairs, during which time the cargo owners and underwriters, to whom abandonment was made, although fully apprised of the condition of the ship, made no demand for the transshipment and forwarding of the sound portion of the cargo, and the cargo owners apparently acquiesced in the de-

livery of the goods by the ship, while the underwriters simply stated that they should hold the ship responsible for the delay, but declined all propositions of the carrier for expediting the delivery. *Held*, that the cargo owners, or their successors in title, were not entitled to recover damages for decline in the market value of such cargo on account of the alleged unreasonable delay in delivery.

**4. SAME—ACTION FOR LOSS BY FIRE—BURDEN OF PROOF.**

Ship owners are not liable under Rev. St. § 4282, for injury to the cargo by fire, unless the cargo owners prove by a preponderance of evidence that the fire was caused by the design or neglect of the ship owners personally.

**5. SAME—DELAY OF VESSEL FOR REPAIRS—DETENTION OF CARGO—NOTICE TO OWNERS.**

When a ship becomes unfit for navigation from a cause which does not involve a breach of duty on the part of the carrier, and it is necessary to interrupt the voyage for the purpose of repairs, the master may detain the cargo until such repairs shall have been effected, but, if reparation be impossible or impracticable within a reasonable time, it may be the duty of the master to use suitable effort to find and employ facilities for transshipping and forwarding the cargo to its destination; but if the owner of the cargo has means of information of the nature of the injury to the ship, and of the opportunities for repair, and of the probable delay, he may be estopped by his acts or acquiescence from claiming damages to the market value of the goods arising from such delay.

Black & Kneeland, for Chas. P. Armstrong and others.

Convers & Kirlin, for the Strathdon, William Burrell, and others.

THOMAS, District Judge. On the 28th day of June, 1894, William Burrell and others, owners of the steamship Strathdon, petitioned for the limitation of their liability. The only claim filed against them is that of Charles P. Armstrong and others, arising from injury to the cargo from fire and water, in the Suez Canal, on November 1, 1893, at about 2:30 o'clock in the morning. Such owners oppose the limitation of liability, and claim damages classified as follows: (1) Injury to cargo in hold No. 2 directly from the fire, and injury to cargo in holds 1, 2, and 3 from water used to extinguish the fire; (2) injury to cargo in hold No. 4 from the grounding and listing of the ship after the fire, whereby water entered such hold through the discharge pipe from the bathroom of the captain's cabin, which pipe, it is alleged, was not supplied with a proper stop valve; (3) loss of market value by reason of unreasonable delay in bringing or forwarding the goods saved after the fire.

The first question is whether the ship owners are liable for injury resulting from the fire. This question involves two inquiries: (1) What was the cause of the fire? (2) Was the fire caused by the design or neglect of the ship owners?

The history of the ship previous to the fire is this: By order of her managing owners, Burrell & Son, of Glasgow, the ship was built by the Tyne Iron Shipbuilding Company, and her engines by Wigham, Richardson & Co., constructors of high rank in their respective professions. Burrell & Son, themselves well-known managers of vessels, employed a competent person to overlook the construction, and such inspection was had, by surveyors from Lloyds' Register, as to entitle the ship to receive, and she did receive, the highest rank for

hull and machinery. After about 3½ years of service, and on the 30th day of September, 1893, she left Java, with a full cargo of sugar, loaded by the charterers or their agents, for the port of New York. She left the port of Suez on October 31, 1893, and on November 1st, at about 2:30 a. m., smoke was discovered issuing from the telegraph conduit from the engine room to the bridge. The smoke came from fire in the cargo stowed in the between-decks, in the locality of the ventilator on the starboard side of the ship, and about opposite the chart-house door, which was slightly abaft the bridge. The ventilator was abreast the donkey-boiler recess, and between it and the side of the ship. The donkey boiler stood in a recess in the stokehole bulkhead, on the starboard side of the ship. The recess was 10 feet wide, and extended 8 feet 7 inches forward, into the No. 2 lower hold, the between-decks over such hold extending over the recess containing the donkey boiler, in which sugar in baskets was stowed, the baskets resting on planks, which in turn were laid on the iron floor of the deck. The donkey boiler was 7 feet in diameter, and 14 feet and 7 inches in height, and the crown of the boiler was 3 feet and 4½ inches below the under side of the between-decks. The back of the boiler was about 18 inches from the back of the recess. On the top of the boiler was a flue of wrought iron, about 18 inches in diameter, which carried the smoke and heat from the furnace into the funnel of the smoke box of the main boiler. The flue rose from the dome of the boiler vertically for a short distance, and then made an elbow, and led aft under the portion of the between-decks, and 19 inches therefrom, over the recess, and thence under the open part of the plate of the starboard bunker. Above the flue, to protect the between-decks, was arranged a system of baffle plates. One plate, about 2 feet and 7 inches wide and 4 feet long, and three-sixteenths of an inch in thickness, was suspended by hangers under the between-decks beams, and about 3½ inches therefrom, which beams were about 7 inches deep. On the sloping diagonal side of the coal bunker, on the starboard side, was a baffle plate, standing 2 inches away from the coal bunkers on the side. This baffle plate was not in the recess, but abaft of it, on the flue itself. There were two semicircular sheet-iron awnings or baffle plates, one outside of the other, one being 2¾ inches away from the flue, and the other 3¾ inches away from the inner end. They did not extend forward of the vertical line of the donkey boiler as it left the top or crown of the boiler, but were about on a line with it, and ran aft on the flue, until it passed into an open space in the stokehole. There is evidence indicating that the circular awnings were put on while the ship was at Trieste for repairs, after the fire, but there is equal evidence that such awnings were, in whole or part, placed after the construction of the ship, and before the fire. The donkey boilers were used to operate the four winches used when loaded or unloaded in port, and on the night in question operated the dynamo for the electric light required in passing through the Suez Canal, having been started about 6:30 p. m. of the previous evening.

It is urged by the cargo owners that, on the night in question, the flue connected with the donkey boilers became greatly heated, and

even red hot; that the heat passed through the space intermediate the flue and the baffle plates, through the space intermediate the baffle plates and the iron floor of the between-decks, through such iron floor, and ignited the sugar stowed in baskets standing on planks laid on such floor. The evidence on the subject is conflicting. The ship owners offer evidence to show that the flue had never been, and was not, red hot on the night in question; the cargo owners offer evidence that the flue was red hot on the night in question, and had been so frequently before that time. The chief engineer, Croft, and the second engineer, Young, testified that the flue was not red hot, and Taylor, a former engineer, testified that it never did get hot during his service. There is also a large amount of opinion evidence tending to negative the probability of such intense heat, especially if the donkey boiler were properly managed. On the other hand, Capt. Waring, in command at the time of the fire, testified that he had seen the flue red hot: and Love, the third engineer, emphatically testified that it was red hot on the night in question, and that he had seen it in such condition on previous occasions. Donovan, a seaman, gives similar evidence. The evidence tends to show that the donkey boiler was driven necessarily to its full capacity, and it is fairly inferable that, under such requirement, the flue became very hot, and that it was probably red hot on the night of the fire.

Did this condition produce the fire? The evidence is sufficiently convincing that such was the cause. No other adequate cause is suggested. A spark from a passing steamer, or from a pipe, passing into the ventilator, the friction of the rubbing baskets of sugar, spontaneous combustion, a match dropped by stevedores in loading, are suggested causes, but this is mere speculation. The red-hot flue was a present, active, effective, agency. Its possible peril was recognized in the provision of the baffling plates and awnings, and the ship owners' experts frequently base their opinion that the fire could not come from the flue, upon the interposition of the baffle plates. Thus, Walker testifies: "My opinion is that no fire could possibly occur, even if the flue were red hot, so long as the baffle plates were there." Moreover, the fire had its beginning at the place where it should have started with the flue as an exciting cause. Great heat and the beginning of the fire are thus brought into juxtaposition, and it is fair to infer the causal relation. Direct evidence that the flue was the vital cause is not wanting. Donovan, seaman, dunnaged the No. 2 hold between-decks, when the same was loaded. He speaks of the intolerable heat in this hold directly over the donkey boiler, arising, as he says, from the boiler, and Dunton, the ship carpenter, testified that in his opinion the donkey boiler caused the fire. A studious and prolonged consideration of the evidence leads to the conclusion that the heated flue caused the fire.

The remaining question, on this branch of the case, is this: Was the fire caused by the design or neglect of the ship owners? for, under section 4282 of the United States Revised Statutes, ship owners are not liable for loss or damage to merchandise, unless the fire be caused by their design or neglect. The primary law is, therefore,

one of nonliability, except under the conditions stated. From ordinary rules, it is inferred easily that, after the loss has been shown to have arisen from fire, the burden is on those asserting that the fire was caused by the ship owner's design or neglect to prove it, and, indeed, the authorities are to that effect. Keene v. The Whistler, 2 Sawy. 348, 14 Fed. Cas. 208; The Victory, 168 U. S. 410, 423, 18 Sup. Ct. 149; Claflin v. Meyer, 75 N. Y. 260. It is also the rule that the design or neglect of the ship owners, respecting some duty to be fulfilled by themselves, and not by their servants, is involved. Transportation Co. v. Wright, 13 Wall. 104, 120; Craig v. Insurance Co., 141 U. S. 638, 12 Sup. Ct. 97; The Rapid Transit, 52 Fed. 320. Hence, the ship owners are not liable for injury to the cargo by fire, unless the cargo owner prove by a preponderance of evidence that the fire was caused by the design or neglect of the ship owners, touching some duty that was imposed on them personally. A strained meaning should not be given to the words "design or neglect." The word "design" contemplates a causative act or omission, done or suffered willfully or knowingly by the ship owner. It involves an intention to cause the fire, or to suffer it to be caused by another. The culpability is in the nature of trespass. It is not understood that there is any claim that the fire in question was caused by such design of the ship owners. The word "neglect" has an opposite meaning. Negligence involves the absence of willful injury, and is an unintended breach of duty, resulting in injury to the property or person of another. Were the ship owners guilty of such breach of duty? The duty was to use due care (and it may be assumed that a high degree of care would be required) to furnish a donkey boiler, if one were furnished at all, so related to the other parts of the ship that the cargo carried in the ship would not be fired, directly or indirectly, by the action of such a boiler, at least when properly used. What should suitably prudent proposed ship owners do to fulfill this duty? If they were not competent shipbuilders, they should engage persons of proper skill and carefulness, and delegate to them the performance of the duty. If the duty could not be delegated so as to exempt them from liability, yet the skill and care of the builders would inure to the benefit of the ship owners. Accordingly, in this case, the ship owners employed the Tyne Iron Shipbuilding Company and Wigham, Richardson & Co.; the former to construct the ship, and the latter to make the machinery. There is unassailed evidence that these firms are among the most competent in their vocations. The ship owners appointed their own expert agent to watch the construction, and surveyors from Lloyds' Register approved the plans, and the construction proceeded under their personal supervision, entitling the ship to supreme rank for hull and machinery. Nevertheless, it may be that any negligence of the builders would obligate the ship owners. Therefore it should be ascertained whether any criticism of their work is sustained by the evidence. In the first place, it must be noticed that no witness, skilled in such matters, has testified (1) that the construction of the donkey boiler and flue was unusual; (2) that it was unsafe; (3) that there was not sufficient protection. It is not pointed out that in a

single instance any other ship ever had other and better protection, nor are the devices used to secure the safety of the Strathdon accused by the opinion of a single expert in shipbuilding, machinery, or furnace arrangement. From the whole craft of practical men, not one is called to declare that, in theory or fact, the combination of the donkey boiler and flue and baffle plates, and the relation of the same to the ship, were condemnatory in the slightest degree. Does such a critic exist? If so, why is his evidence absent? But what is the counter evidence? After construction by and under the supervision of artificers of recognized eminence in their vocations, it appears that the ship successfully underwent the test of repeated surveys at London, in 1890 and 1891; at Glasgow, in 1890 and 1893; at Hamburg, in 1891 and 1893; at Boston, in 1892; and at Cardiff, in 1892. Before the fire she had been navigated under varying conditions, carrying rice between London and Natal and Rangoon; voyaging from Cardiff to Port Said; thence to Taganrog; thence to Amsterdam, carrying grain; going from Amsterdam, London, and Glasgow to Penang, Singapore, and Java; thence from Rangoon to Bremen, carrying rice; proceeding from Hamburg to New York; thence to Sydney; thence to London, carrying wool; thereafter voyaging from Cardiff to Bombay; and thence to Hull, carrying seeds; again from Cardiff to Algoa Bay, Java, and Boston; New York to Japan; and from the Phillipines to London, carrying sugar to Boston and hemp to London; again from Antwerp to Glasgow; to Singapore, China, and Japan, with general cargo; and she was on her return voyage at the time of the disaster under consideration. During all this time her between-decks were stowed with the products composing her cargo, and the donkey boiler was used to operate the winches, and on several occasions she passed through the Suez Canal. There is no evidence of recognized danger from the flue during all of these undertakings. Numerous witnesses approve the arrangement and safety of the donkey boiler. Mancor, for 12 years a Lloyds' surveyor; Brown, consulting engineer, who took charge of her repairs at Port Said; Walliker, Lloyds' surveyor, and inspector of the Strathdon during her construction; Heslop, an expert engineer, who surveyed her at Port Said; Bone, for many years a Lloyds' and government surveyor, and manager of the Tyne Iron Shipbuilding Company at the time of the ship's construction; Stolfa, naval architect and chief naval engineer of the Austrian Lloyds; Baccichi, vice inspector of machinery to the Austrian Lloyds; Schnable, Lloyds' surveyor at Trieste; Martin, ship engineer and surveyor of 28 years' experience; Congdon, chief surveyor in the United States for Lloyds' Registry,—all of these skilled persons, skilled in theory and by experience, and of large acquaintance with the details of donkey boilers in many other vessels, represent to the court that this donkey boiler, with its flue, complied with all the known demands of skill and safety. Shall the court disregard this consensus of valuable opinion, and without evidence hold that there were better and other methods of protection in practical use? The only evidence that contradicts this is the fire itself, which shows that the method was not safe for that cargo of sugar. But the point of inquiry must be kept in mind. The

present question is not whether the arrangement is shown to have been unsafe in the particular instance, but was the ship owner negligent in supplying the arrangement and in failing to apprehend that the same would probably be so used as to cause the fire? Negligence may not be inferred, at least in this case, from the ultimate event, but the test is rather, what provision would a very prudent business man, skilled in such affairs, have made under the circumstances, not knowing that this particular fire would occur? If now the ship owner has employed such reputable constructors, and if the use of the completed ship for several years justify the propriety of its arrangement and precaution against fire, and if very skilled men pronounce that the work accords with the existing knowledge of their profession, and if no man be forthcoming to declare otherwise, why should the ship owners be held to have failed in skill or diligence? Their care and skill should be equal to the prevailing knowledge of the mechanism which they undertake to construct and use, and to that standard they have attained. If there was any higher skill or ability existing at any time before the fire, evidence of it should have been given. In the absence of such evidence, and in view of the ample proof that what was known on the subject was employed in the construction of the donkey boiler and flue, the ship owners must be considered suitably diligent. It results that they are not liable for the injury to the cargo resulting from the fire.

But to what extent is the fire the proximate cause of the injury to the cargo? It seems to be admitted that it is the proximate cause of the injury to the goods injured by burning, or by water used to extinguish the fire, save the goods injured by water in hold No. 4, and as to these goods it is contended that the proximate cause was not the fire, but rather the absence of a valve in the pipe from the bathroom of the captain's cabin. After the fire began, such proceedings were taken to extinguish it that the ship grounded and listed to starboard, allowing the water from the canal to enter the pipe and find its way to hold No. 4. Such a condition of grounding, listing, and receiving the water was not independent of the main cause, viz. the fire, and the efforts employed for its extinguishment, but had direct causal connection therewith, and followed therefrom. Had the ship owners been liable for the damage proximately resulting from the fire, they obviously would have been liable for the damage to the goods in hold No. 4. Hence, under the exemption from liability for the fire as herein established, they are exempt also for the injury to such goods. The fire was the direct occasion for the subsequent conditions that culminated in the water entering the bath pipe, and exoneration from the cause is exoneration from the effect.

The remaining question relates to the liability of the ship owners for the delay resulting in a decreased market value of the goods delivered in New York. This involves considerations quite apart from those already presented.

Where a ship becomes unfit for navigation from a cause which does not involve a breach of duty on the part of the carrier, and it is necessary to interrupt the voyage for the purpose of repairs, the master

may detain the cargo until such repairs shall have been effected; but, if reparation be impossible or impracticable within a reasonable time, it may be the duty of the master to use suitable effort to find and employ facilities for transshipping and forwarding the cargo to its destination. The Niagara v. Cordes, 21 How. 7; The Maggie Hammond, 9 Wall. 435; Bork v. Norton, 2 McLean, 422, Fed. Cas. No. 659; The Joseph Farwell, 31 Fed. 844; The L'Amerique, 35 Fed. 35; The Centurion, 1 Black, 170; Harrison v. Fortlage, 161 U. S. 7, 64, 16 Sup. Ct. 488. The English law relieves the master of the duty of transshipment and forwarding, but permits the same. He may retain or store the cargo until the completion of repairs, and thereupon carry it to the port of delivery, thereby earning his freight. Atwood v. Sellar, 4 Q. B. Div. 342, 359; Svendsen v. Wallace, 10 App. Cas. 404; Carv. Carr. by Sea (2d Ed.) § 304, p. 312. The numerous authorities cited by the petitioners' advocate sustain the proposition. The petitioners contend that the stipulation in the charter party requires that the British law shall govern. It provides: "It is also mutually agreed that the carrier shall not be liable * * * for any loss or damage caused by the prolongation of the voyage; also that this contract shall be governed by British law, in reference to which law this contract is made." Article 2. In the present case the bills of lading for the carriage of the cargo from Java to New York were given, but such bills recited that the carriage was made pursuant to the charter party, and that delivery was to be made to the order of the charterers. It is urged, in the very able argument for the cargo owners, (1) that the stipulation does not refer to loss or damages from a decline of market value, but to physical injury to the cargo; (2) that the Harter act renders invalid any stipulation lessening, weakening, or avoiding the obligation to properly deliver the cargo. The view taken of the present case renders unnecessary a decision of the question of the influence of the stipulation upon the ship owners' liability; for it appears that such liability does not exist under the rule of the federal decisions. This is illustrated by the nature of the injury, the expedition of the ship owners in the work of restoration, and the policy of the underwriters to express no advice or wish concerning the disposition of the cargo, but rather to leave the carrier in his embarrassment, unaided by counsel, and unconstrained by demand for any definite action. The fire occurred during the night of November 1, 1893, and was subdued by means of the ship's hose and the Suez Canal Company's fire boat, whereby the holds, save hold No. 4, were flooded, and the action of the fire boat continued until November 5th. During this time the ship grounded, and listed to starboard, taking in large quantities of water, flooding her decks, and the No. 4 hold, through the bath pipe, as above mentioned. On November 6th the ship was righted, and taken to Port Said. Thereupon was begun the work of pumping the water from the holds, and the removal of the cargo, which was begun by the use of lighters on November 3d, was continued until November 15th, when, by the arrival and interposition of an agent of the cargo interests, it was suspended until November 19th. The removal of the

cargo then seems to have proceeded, and was completed on December 18th, during which time, pursuant to certain surveys of the vessel, the removal of the plates from the ship's side was undertaken by the Suez Canal Company; but on December 13th this work was suspended, for the apparent reason that the facilities for proper repair at Port Said were found inadequate, and, pursuant to further surveys, temporary repairs were begun on December 21st, and finished January 19th; and a certificate of seaworthiness, permitting her to do so, having been duly obtained, the ship, on December 21st, sailed for Trieste, where she arrived on December 27th; and thereupon, pursuant to surveys and specifications, repairs were continued through each day of the week, until April 26th, when the vessel sailed for Port Said, where she arrived May 2d, and took on the remnant of the cargo; then, on May 6th, sailed for New York, where she arrived on June 1, 1894, and delivered the cargo to the consignees thereof, who accepted and paid the freight thereon. What did the carrier omit in the way of diligence in making the repairs? The cargo owners do not point out a single misstep, a culpable act, done or omitted, in the restoring of the ship to seaworthiness. But did the delay, although not in itself unnecessary, constitute an unreasonable detention of the goods without forwarding? The attitude of the cargo owners at the time towards the existing condition is instructive. On November 11th, Capt. Brewer, representing the cargo owners, arrived at Port Said, and presumptively learned the extent of the disaster, the probable duration of the delay, and the possibility for transshipment and forwarding. It is not pointed out that he suggested any means of facilitating the delivery of the cargo. The information he received from his personal observation was transmitted, it may be assumed, to his principals. It does not appear that they afforded any indication of a desire for transshipment or forwarding. What did they do? An attempt was made by the ship owners, through an accredited agent, to provide for transportation of the freight upon just terms. The negotiation was between such agent and Wendt & Co., of London, representing the underwriters on the cargo, to whom abandonment was made on November 3, 1893. An agreement between such representatives was arranged, and the agent of the ship owners, not having been advised of the abandonment of the cargo to the underwriters, required Wendt & Co. to sign the agreement for the consignees, or obtain their consent thereto. A cable to that effect to the underwriters on November 18th brought a reply unintelligible to both parties, and when, on November 23d, an explanation was asked, the reply was: "Prefer decline further interference or explanation. Notify Strathdon owners that we hold them responsible for delay." It appears that Armstrong & Co., when applied to, had declined to give any instructions, and that some of the underwriters to whom abandonment had been made had not paid the loss, and this accounts probably for the failure of this negotiation. A later offer, made December 14th, was declined by the underwriters, as follows: "Decline intervening; shall hold ship responsible." December 23, 1893, the agents of the ship owners requested Messrs. Wendt & Co. to cable the follow-

ing dispatch to their principals in America: "It is proposed to send on cargo by another steamer if consignees and underwriters of cargo approve. Cable reply." On the same date Wendt & Co. answered such request, as follows: "We beg to acknowledge the receipt of your letter of this date, and have noted its contents, but, under all the circumstances, we must decline to accept the same, and consequently return it herewith. As you will acknowledge, all through the case we have endeavored to help your underwriters and the ship owner. Our clients having so far expressed their determination not to entertain any further suggestions, it must now be left to the ship owner to place himself in communication with the consignees of the cargo, if anything further is required. We have never acted for consignees, and told you so distinctly." And on January 2, 1894, Wendt & Co. again wrote, declining to have anything more to do with the case.

From and after January 6, 1894, to May 16th, a correspondence existed between the petitioners and the claimants, in which inquiries were made concerning the vessel, and the probable date of sailing, but no suggestion whatever as to forwarding the cargo; and the tenor of the claimants' letters show entire acquiescence in the final determination of the carriers to repair the ship at Trieste, and thereafter bring forward the cargo; and, although the underwriters completed the payment of the loss March 29th, they thereafter were content with their previous position, which was to suggest nothing, to accede to nothing, to state nothing, except that they would hold the ship responsible for the delay. The underwriters declined the agreement made by their agents; the agents declined to ask the approval of the consignees and underwriters to the proposition to send the cargo by another ship; the consignees obviously acquiesced in the delivery of the cargo by the Strathdon; and the underwriters cannot be heard to object, in view of this history, to the course that was adopted by the ship. It is concluded that the cargo owners may not recover damages for an alleged unreasonable delay in the delivery of the cargo.

Decrees should be entered pursuant to the foregoing findings. In Armstrong v. The Strathdon, so far as that action involves a demand against the ship for the recovery of a just general average contribution, the parties will take such further proceedings as they may be advised.