E. A. McINERNEY, J. D. McINERNEY and W. H. McIN-
    ERNEY, Trustees, etc., of M. McINERNEY, doing busi-
    ness in the name and style of M. McINERNEY *v.* THE
    BARK "C. D. BRYANT", her tackle, etc.

DECIDED:  AUGUST 22, 1901.

1.  Where it was shown that the bark C. D. Bryant, when it left its
    home port, San Francisco, California, was in perfect seaworthy

condition, well equipped, manned and provisioned for her voyage to Honolulu, but when moored to the wharf at Honolulu took fire in the night time, and it was found necessary to scuttle the vessel and allow her to partially fill with water in order to extinguish the said fire, by reason of which facts the cargo, including the merchandise of the libellant, consisting of clothing and shoes, was seriously damaged to the injury of libellant; and where it was shown that the fire arose through the negligence of the ship's officers in leaving an open hatch leading to the hold, wherein was stored liquors covered with baled hay, which latter formed a very combustible portion of the cargo, and no watch being kept on said ship while in port and while her cargo was being unloaded; and where there was no evidence of any "design or neglect" upon the part of the owners of said vessel by reason of which said fire might have been caused; *Held*, that under the provisions of Section 4282 of the R. S. U. S. continued in force by the Act of Congress of February 13, 1893, commonly called the "Harter" Act (Vol. 27 U. S. Stats., p. 445), the owners of said vessel cannot be held to answer for the loss or damage to libellant arising from said fire, decided to be the proximate cause of the injury to his merchandise.

2. The words, "management of the vessel," in Section 3 of the "Harter" Act, cannot refer to the navigation of the ship while at sea, because there is an especial clause as to that. It applies rather to a "fault or error" resulting from the management of the business of the ship or the discipline thereof; as in this case, the failure to have a watch while in port, which concerned both the safety of the ship and its cargo, or the failure to do some thing which does not belong to the navigation or movement of the ship, but which affects in some degree both the ship and the cargo.

3. The keeping of a watch is a "part of the management of the vessel" for the mistakes in which the owner and the vessel are both exempt under the provisions of the third Section of the "Harter" Act so-called.

4. While the case at bar is a proceeding *in rem* against the vessel, a decision in favor of libellants against the vessel and decreeing its sale for the payment of the amount of the judgment found due, would be simply a decree against the owner of the vessel; for if the vessel is sold, it is the property of the owner which is sold, and he would in that case be punished for something of which the Statute (Section 3, "Harter" Act) says he shall be exempt.

5. After the loss has been shown to have arisen by fire, the burden of proof is on those asserting the fire was caused by the "neglect or design" of the ship owner.

IN ADMIRALTY. LIBEL *in rem* FOR DAMAGES TO MERCHANDISE.

*Hatch & Silliman*, proctors for libellants.

*Kinney, Ballou & McClanahan*, proctors for respondents.

ESTEE J.   It appears that the American Bark, "C. D. Bry-
ant," libellee herein, whereof one P. Colly is master, and J.
Kentfield & Co., intervenors and claimants, are owners, was on
the 18th day of June, 1901, lying in the port of San Francisco,
and bound for the port of Honolulu, having on board at that
time, twenty-six packages of merchandise belonging to libellant,
to-wit: one case of clothing and twenty-five cases of shoes, and
also having on board certain other cargo, mostly machinery,
the property of other people.

That thereafter, said bark sailed for the port of Honolulu
with said merchandise aboard where she arrived on or about
the 3rd day of July, 1901; that on Sunday morning, the 7th
day of July, 1901, a fire broke out near the forward hatch of
said vessel, where the aforesaid merchandise was stowed, and
by reason of said fire, large quantities of water were poured
into the hold of said vessel, and the bark was finally scuttled
by the Captain, in order to extinguish the fire. The ship then
settled down, filled with water, the fire was extinguished and
after the holes were plugged up, the water was pumped out of
the vessel. In the mean time this cargo was seriously injured
by the water and fire. There is no contest as to the fact of the
injury or the amount thereof. The goods were sold at auction
bringing three hundred and ninety-nine dollars, the owners pay-
ing at the same time $22.50 freight thereon.

Libellants bring this action *in rem* against the ship alleging
damage in the sum of eleven hundred dollars for the failure to
deliver the said merchandise "in good order and condition" and
alleging that by reason of the careless, negligent and improper
care and custody of the said merchandise, and the want of proper
care on the part of the master of the said ship, its officers crew
and persons employed by him or them, the said merchandise
was consumed by fire or ruined by water. The owners of the
said vessel, through Captain Colly, the master, claim exemption
by reason of the fact that the goods were injured by fire and
that the fire was not caused by the "design or neglect" of the
owners of the vessel or of the officers or crew thereof; and that

whatever loss or deterioration claimed, that the same was done without the privity or knowledge of the owners or charterers or the officers or crew of the vessel; they also claim a further exemption by reason of a clause in the bills of lading that there would be no liability upon the part of the vessel, her owner or charterers for "dangers and accidents of the seas and navigation of whatsoever kind or nature" alleging that the loss to the goods was caused by a "danger of the sea" within the meaning of the clauses aforesaid.

This ship is a common carrier for hire and the owner of all goods on the vessel is primarily entitled to have reasonable care exercised by the said carrier whether in port or not. · In this case the ship is liable for the value of these goods unless they were lost by the Act of God, or public enemies, or the fault of the shipper, or by reason of some exception mentioned in the bills of lading, or under the provisions of Sections 4282 to 4287 of the Revised Statutes of the United States or of the so-called Harter Act of February 13, 1893. (Vol. 27 U. S. Stats. P. 445).

The question is were the goods damaged or lost by a fire which would exempt the owners under the provisions of Section 4282 of the Revised Statutes, which reads as follows:

"No owner of any vessel shall be held liable to answer for or make good to any person, any loss or damage which may happen to any merchandise whatsoever which shall be shipped, taken in or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the 'design or neglest' of such owner."

It seems the ship came into the port of Honolulu all right, was brought up to the wharf properly and so far as the testimony shows was well equipped, manned and provisioned for the voyage to Honolulu, and in a sea-worthy condition, and only suffered injury by reason of the fire first discovered by the carpenter of the ship about five o'clock on the morning of the 7th of July, 1901. The Captain had been out on the evening before the fire until 11 o'clock p. m. when he came aboard.

The two mates were then in their berths asleep. No watch was kept on board the vessel although the Captain testified that "that night was the second mate's turn aboard." There was a ladder down the side of the ship so that any one could get on board, and the Captain testified that after he had turned in he heard two men come aboard and also heard them walking on the deck; but it does not appear that he either got up or made any attempt to investigate who they were or what they wanted.

It further appears that in the cargo were several barrels of beer and cases or barrels of whiskey and that they were covered up with one or two tiers of baled hay; that on the morning of the fire and after it was well under way, four of the crew left the ship, two of them in an intoxicated condition.

The Captain testified: "This fire was reported to me about 5:15 in the morning of July 7th, 1901. I was in my room on the ship. When I came out of my room, the fire and smoke came out under the forward hatch and extended up as high as the foreyard. *The forward hatch was open. It was battened down the night before.* That hatch was open the biggest part of Saturday, so we could get the gear out. The fire was limited to the fore part of the ship. All my men except four responded to duty. I scuttled the ship about 9 o'clock in the morning of the 7th of July, when the ship settled down and extinguished the fire. As soon as the fire was out, I plugged up the holes. *I did not see the forward hatch put down the day before.*

"I do not know who was aboard when I got there. I did not bother. They might have been there or ashore (referring to the sailors). The men could go ashore or stay aboard. The beer was covered with hay. A sailor will get at beer or whiskey if he can."

"I can't say whether the four sailors who left the ship got at the whiskey in the hold or not. I am trying to find out."

The Captain further testified: "I have been coming to this port several years. If I had a watchman it would appear in my accounts to the owners at the end of the voyage. The owners knew we did not have a watchman at the wharf." This

statement was to some extent qualified by the re-examination of the witness on the part of the libellee, when asked what things went into the account of the ship rendered by him to the owners at the end of the voyage: he said, "where she is and so forth."

Q.  As to whether you have officers on deck at night while you are in port or not, do you report that to him?

A.  No, sir.

Q.  Does he (the owner, Ed. Kentfield) know anything about it so far as you know?

A.  No, sir."

It is clear that the fire originated in the forward part of the vessel and it evidently commenced in the night. The forward hatch was off when the fire was discovered in the morning, and it would seem reasonable to suppose that it had not been put on since it was taken off the day before, or if put on, the officers of the vessel did not see that it was kept on, as should have been done by the maintaining of a watch on board. No one could have reached the liquors in the hold of the vessel except through an open hatch and there being no watch this was easy to do, and especially so if the forward hatch was open.

In the opinion of the Court it is quite as necessary to keep a watch on ship board when in port as when at sea, and particularly so when the hatches are opened and the cargo is exposed and in process of being removed.

The Court is satisfied that the fire was caused by the carelessness of the officers and crew of the vessel. Some of the crew evidently got at the cargo of liquors through the open hatch, which could not have occurred if a watch had been kept. Four seamen deserted on the morning of the fire and during its progress; two, if not all of them were under the influence of liquor when they left the ship, and there is a strong presumption that they had obtained the whiskey or beer or both from the cargo, for it was early in the morning when they were first seen aboard the ship intoxicated. They evidently got at the cargo during the night time, and accidently set the baled hay on fire in the hold of the vessel. The watch on the ship was necessary

alike for the safety of the ship and its cargo, for the loss or injury to the one might and usually would include the loss or injury to the other as in this case where it appears the loss to the ship was 50 per cent of its value.   And the lack of a watch was great negligence on the part of the Captain, which was aggravated by the leaving of the hatch open, and this negligence was the greater by reason of the fact of the cargo being hay and very combustible.

In this case there is practically no testimony showing or tending to show that the owners by either their "design" or "neglect" caused this fire.   The keeping of a watch is a part of the management of the vessel, for the mistakes in which the owner and the vessel are both exempt under the provisions of the third Section of the Act of Congress of February 13, 1893, commonly known as the "Harter Act," and found in Vol. 27, Statutes of the United States, page 445, and which Act but for Section 6 thereof might modify the Act of March, 1851, (Sections 4282-4287 Revised Statutes) but said Section 6 prescribes:

"That this Act shall not be held to modify or repeal Sections 4281, 4282 and 4283 of the Revised Statutes or any other statute defining the liability of vessels, their owners or representatives."

In construing the Harter Act, it was held by the Supreme Court of the United States in the case of *The Irrawaddy*, 171 U. S. 187, 193, that—

"Plainly the main purposes of the Act were to relieve the ship owner from liability for latent defects not discoverable by the utmost care and diligence, and, in the event that he has exercised due diligence to make his vessel sea-worthy, to exempt him and the ship from responsibility for damage or loss resulting from faults or errors in navigation or in the management of the vessel."

After the loss has been shown to have arisen by fire, the burden of proof is on those asserting the fire was caused by the neglect or design of the ship owner.   *The Strathdon*, 89 Fed.

374, 377-8. *Craig v. Continental Insurance Co.*, 141 U. S. 638. So it has been held that the owner is not responsible for the negligence of the officers of the ship. *Craig v. Continental Insurance Co.*, 141 U. S. 638, 646; *Walker v. Transportation Co.*, 3 Wallace U. S. 150.

As has been said, this ship was well manned, equipped, and in a sea-worthy condition when she left the port of departure, and nothing to the contrary has been attempted to be shown upon the part of the libellants.

Referring again to Section 3 of the Harter Act, it is provided that after due dilligence has been exercised to make a vessel in all respects sea-worthy, and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers shall become or be held responsible for damage or loss resulting *from faults or errors in navigation or in the management of the vessel* .......... or be held liable for losses arising from dangers of the sea. * *"

It is evident that the words "management of the vessel" cannot refer to the navigation of the ship while at sea, because there is an especial clause as to that, but that it applies rather to a "fault or error" resulting from the management of the business of the ship or the discipline thereof, as in this case the failure to have a watch while in port, which concerned both the safety of the ship and its cargo; or the failure to do something which does not belong to the navigation or movement of the ship, but which affects in some degree both the ship and the cargo.

The exceptions in this case are not found alone in the bills of lading, although they stipulate to relieve the vessel "from the perils of the seas," but the proximate cause of the injury to the libellant's goods in this case did not arise from a peril of the sea but from fire while in port. The case of *The G. R. Booth* cited by counsel and found in 171 U. S. 461, is upon a careful examination not believed to be in point.

As was said in the case of *The Providence & New York S. S. Co. v. The Hill Mfg. Co.*, reported in 109 U. S. 578, quoting

from page 602, the Court referring to the law prior to 1851, said:

"Fire, except when produced by lightning, not being regarded in the commercial law as the act of God, ship owners, as common carriers, were held liable for any loss or damage caused thereby. The first Section of the Act of 1851 was no doubt intended to change this rule. It was copied (all except the last clause) from the second section of *26 George III.*, ch 86, passed in 1786. The last clause of the Section excepting from its operation cases in which the fire is 'caused by the design or neglect' of the owners, was probably implied in the English statute without being expressed as in ours. In all cases of loss by fire, not falling within the exception, the exemption from liability is total."

This action is a proceeding *in rem* and libellants urge strongly upon the Court that they are not asking any relief against the owners of the ship; that all they wish is a remedy against the ship itself, the offending thing. I fail to see the distinction made by counsel in this respect. A decision in favor of libellants against the ship and decreeing its sale for the payment of the amount of the judgment found due, would be simply a decree against the owner of the vessel, for if the ship is sold it is the property of the owner which is sold, and he would in this case be punished for something of which the Statute says he shall be exempt.

Counsel for libellants rely largely upon the case of the *City of Norwich*, reported in 118 U. S. 468, and also upon *The Scotland*, found in 105 U. S. page 24, but upon an examination of both these cases I find they fail to sustain his position.

In *The City of Norwich*, there was an application on the part of the owners of the vessel for a limitation of their liability under Section 4283 of the Revised Statutes. There was no question about the liability of the owners, but simply as to the amount of such liability and whether after the vessel had been appraised immediately after the collision at $70,000, and subsequently repaired and put in good condition so as to enhance

its value greatly, it was liable beyond the said sum of $70,000.

In reference to Section 4283, and the question whether the liability of the owner in the cases therein provided for, shall not exceed the amount of the value of his interest in the ship and freight, the Court there said:

"This provision is absolute and the owner may have the benefit of it not only by a surrender of the ship and freight, but by paying into Court the amount of their value appraised as of the time when the liability is fixed. This as we have seen enables the owner to reclaim the ship and put it into complete repair without increasing the amount of his liability. The absolute declaration of the statute that his liability shall not exceed the amount or value of the ship and freight, to-wit at the termination of the voyage, has the effect when that amount is paid into Court under judicial sanction of discharging the owner's liability and thereby of extinguishing the liens on the vessel itself and of transferring those liens to the fund in Court."

The Court saying further:

"To say that an owner is not liable, but that his vessel is liable seems to us like talking in riddles. A man's liability for a demand against him is measured by the amount of property that may be taken from him to satisfy that demand . . . . . . nor can we assent to the proposition that the proceeding (*in rem*) is not in effect a proceeding against the owner of the property as well as against the goods; for it is his breach of the laws which has to be proved to establish the forfeiture and it is his property which is sought to be forfeited. In the words of a great judge, 'goods as goods cannot offend, forfeit, unlade, pay duties or the like but men whose goods they are.'" (*Vaughan, C. J. in Sheppard v. Gosnold*, Vaughan 159, 172.)

*Boyd v. United States*, 116 U. S. 616.

In the case of *The Scotland*, 105 U. S. 24, the defense relied upon a limitation of liability under Section 4283 of the Revised Statutes, and the Court held that the "libellees should have paid the value of the ship's strippings and remnants into Court."

In the case of *The Anna Keene v. The Bark Whistler*, reported in 2nd Sawyer, 348, where a libel was filed *in rem* to recover damages for injuries to goods by fire caused by the alleged negligence of the master, who was also a part owner, but the loss was not caused by the design or neglect of the other part owners, it was held in construing Section 1 of the Act of March 3, 1851 (Section 4282 of the Revised Statutes) that the libel must be dismissed, the Court using the following language:

"The master as part owner is together with the other part owners, protected by the statute; but if he has been guilty of neglect he may be held responsible beyond the value of the ship and freight in a suit against him personally as master, charging him with being the cause of the damage by his misconduct, and that this cannot be done directly or indirectly in another suit, i. e., a suit against the vessel."

So also the very recent case of *The Queen of the Pacific*, reported in 180 U. S., at page 49, where in the bill of lading there was a limitation of thirty days' time within which to present a claim for damages for loss on a vessel belonging to the Pacific Coast Steamship Company. The vessel was sunk with her cargo but afterwards raised and repaired. No presentation of claim was ever made until four years thereafter, when the vessel was libelled. The defense set up non-compliance with the provision in the bill of lading. The answer was made that the "limitation applied only to the claim against the steamship company or any of the stockholders thereof, and not to claims against the vessel."

Whereupon the Supreme Court said:—

"The first objection is quite too technical. It virtually assumes that there were two contracts, one with the company and one with the ship, the vehicle of transportation owned and employed by the company; and that while the company as to all its other property is protected by the contract, as to this particular property used in carrying it out, it is not so protected. But if such be the case with respect to this particular

stipulation, must it not be so with respect to the other stipulations?........Thus—'the responsibility of said company shall cease immediately upon the delivery of the said goods from the ship's tackles.' Can it be possible that the responsibility of the ship shall not cease at the same time? 'The company shall not be held responsible for any damage or loss resulting from fire at sea or in port........' but shall the company be exempt and not the ship?........These questions can admit of but one answer. There was in truth but one contract and that was between the libellants upon the one part and the company in its individual capacity, and as the representative of the ship upon the other........The 'claim' is in either case against the company, though the suit may be against the property."

In conclusion, I am of the opinion that as the proximate cause of the injury to the libellant's goods was due to fire on board the "C. D. Bryant," not shown to be due either to the "design or neglect" of the owners of said vessel, the negligence shown being that of the officers and men of the ship in the "management of the vessel," the owners are not responsible under Section 4282 of the Revised Statutes, and both the owners and the vessel are exempted under the terms of the third Section of the Harter Act, under the circumstances as shown in this case. Therefore, the libel as to the vessel should be dismissed, and the same is hereby ordered dismissed without prejudice and without costs.