## McCALDIN v. CARGO OF LUMBER.

### SAME v. PHILADELPHIA & G. S. S. CO.

#### (District Court, E. D. Pennsylvania. July 26, 1912.)

#### Nos. 42, 43, of 1910.

1. SHIPPING (§ 42*)—CHARTERS—FITNESS OF VESSEL.

Under a time charter party, warranting the vessel to be tight, staunch, strong, and in every way fitted for the service, and giving the charterer the right to cancel if she becomes defective for service, she is not required to be perfect, but in good condition and efficient and reasonably safe for the service which is required of her.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 156–164; Dec. Dig. § 42.*]

2. SHIPPING (§ 58*)—CHARTERS—FITNESS OF VESSEL.

Evidence considered, and *held* not to justify a time charterer in canceling the charter on the ground that the vessel had become defective for service, where she had been in possession of the charterer for six months under a charter which it had renewed only a short time before the attempted cancellation.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 233–244; Dec. Dig. § 58.*]

In Admiralty. Suit by Joseph McCaldin, managing owner of the steamship Lassell, against a cargo of lumber; Philadelphia & Gulf Steamship Company, claimant. Suit by said McCaldin against the Philadelphia & Gulf Steamship Company in personam. Decree for libelant.

Howard M. Long, of Philadelphia, Pa., for libelant.

Lewis, Adler & Laws, of Philadelphia, Pa., for respondents.

WITMER, District Judge. Two libels are filed by Joseph McCaldin, managing owner of the steamship Lassell; the one, in rem, against a cargo of lumber laden on board the vessel, to recover $2,375 charter hire from March 28 to April 14, 1910, and the further sum of $23.30 damages to the cabin house of the vessel. No evidence having been offered in support of the latter claim, it will not be considered.

The Philadelphia & Gulf Steamship Company, claimant, admitting the use of the vessel from March 28 to April 14, 1910, filed a cross-libel setting up a counterclaim for certain damages specified as growing out of an alleged breach of the charter party.

The other libel is in personam against the Philadelphia & Gulf Steamship Company to recover a balance of $4,607.98 alleged to be due for charter hire from April 14 to July 12, 1910, first allowing certain credits upon recharters.

The respondent denied all liability for the sum claimed in this libel, and defends upon the ground of a surrender of the vessel, because of the libelant's alleged failure to maintain her in a thoroughly efficient state of repairs in hull and machinery, and, furthermore, the failure of being able to proceed on her voyages with dispatch as required by the terms of the charter party.

---

The Lassell hails from New York, and was chartered, with officers and crew, by the respondent, for six months, from June 22, 1909, to December 22, 1909, with the option of renewing the charter, to be used in transporting merchandise between Philadelphia and New Orleans. Continuing in the service of respondent, on November 22, 1910, the charter was extended for a further period of six months, "subject to cancellation of charter at 30 days' notice if the ship becomes defective for service."

The respondent, February 28, 1910, notified libelants that because of the defective condition of the vessel they would surrender her on and after March 28th, claiming that she was unseaworthy and that libelant had failed to maintain her hull and machinery in an efficient state, and that her captain had failed to prosecute the voyages undertaken with dispatch. The vessel continuing to make her voyages, on April 6, 1910, on arriving in port at Philadelphia, suit was brought to recover, by attachment, the charter hire, $2,375, due March 28th preceding. The respondent continued to use the vessel, making an unsuccessful effort on April 12th to surrender the same at Philadelphia. She was subsequently ordered to New York, and was there surrendered to the libelant, after the respondent on April 22d expressed its willingness to have the Lassell chartered by some other people without prejudice to the rights of either party. The Lassell was afterwards chartered and earned considerable money, which was placed to the credit of the respondent on claim of libelant.

[1] The respondent endeavors to justify its action in attempting to terminate or cancel the contract of hire upon the ground reserved, claiming that the vessel had become defective for the service in which she was employed. Did he succeed? Answer to this question implies an examination of the charter of vessel here required, and, furthermore, the efficiency of the one in question. A vessel need not be perfect, or such as cannot break down except under extraordinary peril. If such were the requirements, our merchant marine would altogether disappear. The rule governing is founded, as usually in matters of this character, on good sense and sound reason. The degree of fitness demanded is that which an ordinary, careful, and prudent owner would require his vessel to have at the commencement of her voyage, having regard to all the probable circumstances of it. Carver on Carriage by Sea, § 18. p. 21. The charter party contains the warranty that the "ship shall be tight, staunch, strong, and in every way fitted for the service." The owners, in terms and by legal implication, warranted the seaworthiness of the vessel; that is, that she was reasonably fit for the service in which she was engaged as a merchant freight vessel. What was her condition from the evidence?

[2] This is a practical question, and there is no other criterion, it is well understood, than the judgment of competent, practical men versed and experienced in nautical affairs and in the operation of such machinery. The Lassell was, at the time, classified as "A No. 1" in the Classification Society of the American Bureau of Shipping. She was inspected, shortly before and after respondent's move to cancel the charter, by the United States government board of local inspectors

of steam vessels at the Philadelphia port, and pronounced sufficient for the service; they, saying in their report of April 15, 1910:

"After having carefully examined vessel's hull, boilers, and machinery, we are of the opinion she is in a condition to navigate with safety as a steamer on the route named in her certificate of inspection."

True she is not a new ship, and not as safe, possibly, as those of more modern type and construction; yet it appears from an examination of all the evidence of those who operated and inspected her that she was in good condition and efficient and reasonably safe for the service in which she was engaged. And this is all that could be required. The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241. Then, again, it is presumed that the respondents regarded the ship properly fitted and capable for their employment, having made an extension of the charter using the same, in the service continued, for a period of six months. As was said by Judge Benedict, in The Piskataqua (D. C.) 35 Fed. 622:

"The charterers have much less ground for reclamation because of the result of events accruing after they have definitely accepted the vessel, which they, themselves or by their agents, have acknowledged to be in good seaworthy condition to perform the voyage. This was, on the other hand, for the ship owners the best evidence of good seaworthy condition which they could have, because it proceeded from their own charterers interested in the performance of the voyage."

Whereupon it cannot be allowed that the charterers can come today and argue against a fact which they have themselves acknowledged.

But it is argued that since renewing or extending the charter the ship became so defective as to render her unfit to meet her requirements. This is not borne out by the proof, and it appears reasonable that, having been in service some thirty years, and being of strong build, of good material, which is also implied from her long use and service, she would not deteriorate very rapidly. It is true that the government inspectors reduced her steam pressure from 100 to 70 pounds. However, it does not appear that this affected the efficiency of the vessel. Indeed it had very little, if any, effect upon the speed of the vessel under the load she was accustomed to carry. It is, furthermore, questioned whether she at any time reached or even approximated the full pressure formerly allowed. The log book shows that after the pressure was reduced she made her voyages in about the same time, carrying the same kind and quantity of cargo, as before; hence she lost nothing on account of speed required.

Though the vessel's efficiency was not impaired by reason of reduction in steam pressure, furnishing respondent no reasonable excuse for cancellation of their charter extension, it seems equitable and just that some allowance should be made for increase in coal consumption thereby necessitated. It appears that such reduction, if made, would necessarily cause the consumption of from three to four additional tons of coal daily to maintain her speed, that it required from eight to nine days to make the trip each way, and

that coal cost $3.11 per ton. Taking, as a basis, three tons per day, and eight days each of ten trips made after such reduction, at $3.11 per ton, justifies an allowance to respondent of $746.40. Credit is also allowed respondent for time lost and coal consumed while the vessel was stranded on Tinicum Island, to wit, $587.19 and $155.50; total, $742.69. It appears that the vessel was chartered to Lent April 27, 1910, being then idle at New York, but was not delivered under the charter until April 30th. In view of the testimony that she was placed on the dry dock for repairs on April 26th, and in the absence of any satisfactory explanation, it is presumed that the vessel was undergoing repairs, thereby preventing delivery, for which a credit of $479.99 will be allowed respondent.

The item, $59.60, captain's expenses at Knight's Key, has not been sufficiently proven as being chargeable against the respondent, and is disallowed; and for the same reason two items, $91.70 and $58.85, expenses of James McCaldin, are disallowed.

In No. 42:

| | | |
|---|---|---|
| Charter hire due March 28, 1910 | | $2,375 00 |
| Credits allowed respondent: | | |
| Extra coal consumed | $746 40 | |
| Stranding vessel on Tinicum Island | 742 69 | |
| | | 1,489 09 |
| Balance due | | $885 91 |

Let a decree be entered for this balance, $885.91, due March 28, 1910, with interest from this date, and costs.

In No. 43:

| | | |
|---|---|---|
| Balance due steamer and owners, as per claim of libelant | | $4,607 98 |
| Credits disallowed libelant: | | |
| Captain's expenses at Knight's Key | $ 59 60 | |
| Expenses, James McCaldin | 150 55 | |
| Vessel hire from April 27th to 30th | 479 97 | |
| | | 690 14 |
| Balance due | | $3,917 84 |

Let a decree be entered for this balance, $3,917.84, due July 12, 1910, with interest from this date and costs.