5 F.Supp. 725 (1933)
THE CABO HATTERAS.
DI SALVO BROS., Inc., et al.
v.
YBARRA Y COMPANIA et al., and six other cases.
District Court, S. D. New York.
November 21, 1933.
Bigham, Englar, Jones & Houston and Carter, Ledyard & Milburn, all of New York City (D. Roger Englar, T. Catesby Jones, James W. Ryan, and Rush Taggart, all of New York City, of counsel), for libelants.
Haight, Smith, Griffin & Deming, of New York City (Charles S. Haight, John W. Griffin, Kenneth Gardner, Wharton Poor, *726 and Frank J. Foley, all of New York City, of counsel), for respondents.
HENRY W. GODDARD, District Judge.
Libels by cargo owners against the owners of the Spanish Steamship Cabo Hatteras for total loss of cargo which was on board her and was destroyed with the vessel by a fire at sea on March 4, 1927. The cargo was shipped at Genoa, Valencia, Alicante, and Malaga in January and February, 1927, for carriage to New York. It is conceded that the Cabo Hatteras was a common carrier; that the libelants were the owners of the cargo described in the respective libels; and that it was received on board the vessel at the loading ports and was not delivered at its destination.
The Cabo Hatteras was a steel steamship of 3,635 tons net register of the usual three-island type, which is quite similar to the American-built Hog Island vessels. She was built by the Compania Eskalduna of Bilbao, Spain, under Lloyds inspection and at the time of this voyage was classed by Lloyds as +100 A1. She was in charge of a competent master with an experience of six years in the same trade and who had been in the service of her owners for thirty-three years, and she carried a competent crew. Originally she was operated as a passenger and cargo vessel, but in 1924 her passenger accommodations were removed and the passenger space was converted into cargo space. The bridge deck compartment in which the fire was first discovered was part of the space which previous to 1924 had been used for passenger accommodations. For three years prior to her loss, the Cabo Hatteras was one of a fleet of 34 vessels operated by the respondent company and had been regularly engaged in service between Mediterranean ports and New York carrying the same general class of cargo.
The Cabo Hatteras sailed from Malaga for New York on February 13, 1927, with a general cargo, but a large part of it consisted of bales of rags and iron drums of olive oil. Two days before her expected arrival in New York, while in latitude of 38° North, longitude 70° West, North of Bermuda, at 4:30 o'clock in the afternoon of March 4, 1927, her master discovered that "heavy smoke" was coming out of the samson post ventilator leading from the port side of the bridge deck compartment. The alarm of fire was given immediately. The covers were taken off of the cargo hatch of the bridge deck compartment and the boatswain jumped down into the hatch and looked through and "in that part of the hold where there were stowed bales of rags and drums of oil there was a large fire raging which was constantly gaining headway" and which apparently had started around the samson post. Water from the sea was poured in upon the fire through the lines of fire hose until the hose was burned and all efforts were made to subdue it. However, owing to the dense smoke and wind which fanned the fire, they were not successful and during the evening it became necessary to abandon her; and the crew, and finally the officers and master, were taken aboard the steamship Cabo Torres which had arrived upon the scene bound from New York to Lisbon. Within forty-eight hours the Cabo Hatteras and her cargo became a total loss and a day or so later she was sunk as a menace to navigation by gunfire from a United States Coast Guard cutter.
The Cabo Hatteras was 369 feet and 3 inches long with a beam of 49 feet and 2 inches. The bridge deck compartment where the fire occurred was upwards of 100 feet long and the width of the vessel, from its deck or floor to the ceiling was 7 feet and from the floor to beams was 6 feet 4 inches. The compartment was divided in the center by the engine room casing which extends forward from the after end about half the length of the compartment and which occupies some 16 feet or about one-third the width of the deck. The engine room casing incloses the funnel, uptake, etc., from fire and boiler room below. In the bridge deck compartment were two coal bunkers  one on the port side and the other on the starboard side. These extended inboard from the vessel's side about 8 feet and ran aft for about 22 feet from a line opposite the forward end of the engine room casing. About 6½ feet forward of the engine room casing and of the same width was a hatch 14 feet and 5 inches long. The alleyways or so much of them as were not used for the coal bunkers, the space forward of the engine room casing, and the covered hatch which had a 12-inch coaming around it, were used for cargo. On each side of the bridge deck compartment was a samson post ventilator with a cowl, located about 6 feet out from the engine room casing and just forward of the forward end of it. They extended 24 feet above the superstructure. The interior diameter of the samson posts was 18 inches and the exterior diameter of a pipe leading up from the lower hold into the samson post at the top of the bridge deck compartment was 14½ inches, leaving a 3½-inch space around the smaller *727 pipe for ventilation of the bridge deck compartment. There were doors on each side of the after end of the compartment 3 feet wide; these were partly closed by planks placed across the door in slots in the door posts, except that an opening of 12 or 18 inches was left at the top. There were also doors on each side of the forward end of the compartment, but these were customarily closed and fastened with bolts or iron dogs. There was a space for the circulation of air above the bales, the distances from the bales to the deck beams above varying between 1 and 3 feet. The deck of the bridge deck compartment had a 12-inch crown  so that it was that much higher in the center than at her sides. There were two sets of drainage pipes or scuppers leading from the bridge deck compartment into the bilges; one set located in the outboard corners forward of the coal bunkers and the other set in the outboard corners at the after end of the compartments. She was loaded so as to be a little down by the stern. Below the bridge deck were hanging coal bunkers which extended inward from the sides of the vessel to within 2½ feet of the engine room casing. The Cabo Hatteras had steam fire extinguishing lines in some of its compartments but none in the bridge deck compartments. However, it was equipped with the usual lines of fire hose.
Before the vessel's arrival at Malaga, her last loading port, a quantity of bales of rags and cases of paprika had been loaded and stowed in the bridge deck compartment. Upon her arrival in Malaga, several shipments of olive oil were taken aboard and between 130 and 140 iron drums were stowed in the bridge deck compartment. The drums were inspected just before being loaded and the testimony is that they were new and in good condition. The drums of olive oil were 3 feet long and 2 feet in diameter and of an average weight of 450 pounds. The rags were what are known in the trade as "Dark Cottons" and were hydraulically pressed into bales averaging 2 feet and 7 inches thick and about 4 feet long with an average weight of 700 pounds and were bound with iron bands or wire.
In the after part of the bridge compartment and in the alleyways were stowed two tiers of bales on their sides. Under the bales was dunnage consisting of a layer of boards or planks an inch or an inch and a half thick spaced 3 or 4 inches apart and laid athwartship or fore and aft, and another similar layer laid in the opposite direction. In the forward end of the compartment bales of rags were stowed two tiers high in each corner and between them were cases of paprika with similar dunnage under the bales of rags and there was also dunnage between them and the paprika. From the after corner of the hatch on the starboard side and running up to the bales on the forward end, across to the port side and along the port side, were stowed on end a tier of drums of olive oil upon dunnage consisting of two layers of boards or planks laid in a manner similar to those under the bales of rags. On top of the drums were two layers of dunnage board and then a tier of bales. Around the hatch coaming a row of bales was placed to "chock off" the drums. Between hatch coaming and the bales, blocks of wood were wedged in to prevent any movement of the cargo. Across the top of the hatch was a row of bales on their sides placed there for the purpose of locking the stowage on each side of the hatch to the other. In the space between the after end of the hatch and the engine room casing and extending across to the port side was one tier of bales upon dunnage similar to that under the other bales. The drums and bales were separated by inch boards laid edge to edge so as to form solid partitions. Around the engine room casing there were permanent upright heavy wooden battens providing some 6 inches between the cargo and the casing. All along the vessel's sides at intervals were permanent dunnage planks, and so located there was a space of about a foot between the sides and the cargo.
The Cabo Hatteras was on the southern track and left Spain in good weather. On March 1st she had winds of force 4 or 5 on the Beaufort scale, but at 4 a. m. on March 2d, she met a hurricane; the wind reached force 12 and she was out of control and adrift in the trough of the sea for twenty-two hours when the storm abated sufficiently for her to resume her course. The words of the "protest" filed subsequently by the master with the Spanish Consul General at Lisbon state (as translated into English) "because for six days prior to the day of the hurricane and on account of severe weather comprising sea and wind, they could not obtain their position astronomically." That there was a violent storm for six days before hurricane contradicts the testimony of the crew, and also Mr. Scarr of the United States Weather Bureau, who testified that the Cabo Hatteras ran the 35th parallel in good weather "with no storms whatever" and with winds ranging from "force 2 or 3 to force 5 or 6 at the utmost," although on February 18th *728 and 19th and the 22d and 23d, she had "a considerable northerly swell." During the trial the master testified that just before the fire he had decided to ask an approaching vessel for his position as they had been unable to obtain it themselves because of the cloudy and overcast sky.
Respondents' answer sets up as a separate defense that the loss of the cargo was caused by a fire within an exception in the bill of lading that "this shipment is subject to all the terms and provisions of * * * Section 4282 * * * of the United States Revised Statutes," and that section 4282 (U. S. Code, title 46, § 182 [46 USCA § 182] the American Fire Statute of March 3, 1851) provides that:
"No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped, taken in, or put on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."
Libelants contend that the loss of the Cabo Hatteras and cargo was due to spontaneous combustion in rags which had been allowed to become impregnated with olive oil as a result of improper stowage of olive oil and rags in the bridge deck compartment, and that this negligence was the personal negligence of the respondent. Their contention or theory is that in the heavy weather preceding or during the hurricane, the stowage was broken and drums containing olive oil were damaged and caused to leak and the oil came into contact with and impregnated the rags which were stowed near the drums, and that this, combined with a high temperature in this compartment, particularly in the vicinity of the engine room casing, produced spontaneous combustion resulting in the fire and the loss of vessel and cargo.
The respondents deny that it was improper to stow drums of olive oil in the bridge deck compartment and maintain that it was customary to do so; that the drums and bales of rags were securely stowed and were protected with dunnage; that if the drums had been damaged and any leakage did occur, which is denied, that the oil could not have reached the bales of rags as it would have run through the dunnage underneath the bales and off into the scuppers; that the compartment was adequately ventilated; and, moreover, that the temperature nowhere in the bridge deck compartment was sufficiently high to produce spontaneous combustion in bales of rags even if it had been possible for the olive oil to come in contact with the bales. And the respondents further assert that if there was any negligence in the stowing, it was not chargeable to them personally as the stowage was solely in charge of the master.
It is urged by the respondents that the fire may have been due to inherent vice in the bales, or to a spark from the vessel's funnel blown down the samson post ventilator during the storm, or to friction between the drums, or a cigarette thrown from the bridge or deck might have been drawn into the ventilator, but that what actually did cause the fire is unknown.
In the recent decision of the Supreme Court of Earle & Stoddart, Inc., et al. v. Ellerman's Wilson Line, Ltd., 287 U. S. 420, at page 425, 53 S. Ct. 200, 77 L. Ed. 403, Mr. Justice Brandeis stated:
"The fire statute, in terms, relieves the owners from liability `unless such fire is caused by the design or neglect of such owner.' The statute makes no other exception from the complete immunity granted."
And at page 427 of 287 U. S., 53 S. Ct. 200, 201, said:
"The courts have been careful not to thwart the purpose of the fire statute by interpreting as `neglect' of the owners the breach of what in other connections is held to be a nondelegable duty."
So that the fire statute (section 4283 [46 USCA § 183]) grants the shipowner full immunity for loss of cargo due to a fire subject to the exception mentioned in the statute. The burden of proving that the shipowners were guilty of "design or neglect" is, under the statute, cast upon those who allege it  the libelants. The respondents, the shipowners, upon showing that the cargo was destroyed by fire have brought themselves within the exemption provided by the statute unless the libelants show that the fire was caused by the "design or neglect" of the owners. If the cargo owner proves facts establishing "design or neglect" on the part of the shipowners, then and only then are they liable for the fire loss.
The General Limitation Act (R. S. § 4283 [46 USCA § 183]) and the Harter Act (U. S. C. title 46, § 191 [46 USCA § 191]) do impose upon the shipowner, as a condition of the relief granted by that act, the burden of proving that the loss occurred "without the privity, or knowledge of such owner or owners." *729 But that act is merely an enactment of the ancient law of the sea while the fire statute, which is not a statute of limitation but of exoneration, owes its origin to an English fire statute first passed in 1786 (26 Geo. III C 86). Providence & N. Y. Steamship Co. v. Hill, 109 U. S. 579, 602, 3 S. Ct. 379, 617, 27 L. Ed. 1038. In the Earle & Stoddart v. Ellerman's Wilson Line, Ltd., supra, the Supreme Court explains that the Harter Act (46 USCA §§ 190-195) and the fire statute differ materially in respect to the burden of proof and in some other features.
In The Older, 65 F.(2d) 359, the Circuit Court of Appeals of this Circuit stated:
"Assuming that he did so represent it, the case comes down to whether the libelant has proved that the fire was caused by his `design or neglect'; the burden in such cases being on the injured party. The Salvore (C. C. A.) 60 F.(2d) 683; The Strathdon (D. C.) 89 F. 374, 378. The situation is like any other where the claimant brings himself within an exemption, in which event the libelant must prove that he has been negligent."
See, also, Craig v. Continental Insurance Co., 141 U. S. 638, 646, 12 S. Ct. 97, 35 L. Ed. 886; Earle & Stoddart v. Ellerman's Wilson Line, Ltd. (The Galileo) 287 U. S. 425, 53 S. Ct. 200, 77 L. Ed. 403.
It appearing that the cargo during the voyage was destroyed by fire, it follows from the foregoing that the libelants must prove the cause of the fire and that it was caused by the "design or neglect" of the owners. Since they base their right to a recovery upon the contention that the fire was due to the impregnation of the rags by the olive oil producing spontaneous combustion, they must prove that this actually did occur. In order to establish the ultimate necessary fact, libelants have endeavored to prove the following chain or series of events: (1) That the drums leaked; (2) that a sufficient amount of olive oil was absorbed by the rags to produce spontaneous combustion; (3) that the conditions of temperature, air, and length of time were such as produced spontaneous combustion.
These facts, it seems to me, must be established and by a fair preponderance of the evidence; not left to conjecture or speculation, but they may be proved by circumstantial evidence, and, if definite facts are shown, certain definite and reasonable inferences or conclusions may be drawn from them.
While it appears that the rules which govern spontaneous combustion have never been determined with scientific accuracy, one of the theories which is universally accepted by chemists is that spontaneous combustion in vegetable oils is caused by the absorption or combination of certain acids in the oil (linolenic and linoleic) with the oxygen in the air or what is commonly known as oxidation. This combination produces heat. When and if a sufficient amount of heat is generated faster than it escapes, it may cause a fire. The higher the temperature of the surrounding air the less tendency for the generated heat to escape or to become dissipated into the air, and it also increases the sum total of heat. However, ignition of a liquid from spontaneous combustion does not occur unless some inflammable material like cotton or rags, etc., with carbon in it is impregnated with the liquid, so as to cause a union of oxygen and carbon. The susceptibility to spontaneous combustion depends upon the rate and the extent of oxidation. The rate and extent of oxidation depend largely upon the amount of acid in the oil. The less acid the less rapidly oxygen is absorbed and consequently less heat is generated. Chemists divide vegetable oils, which includes olive oil, into three classes; drying oils, which dry or oxidize rapidly; semidrying oils which oxidize less rapidly; and nondrying oils which oxidize so slowly under ordinary conditions that oxidation is disregarded for practical purposes. The typical drying oil is linseed which contains a high percentage both of linolenic and linoleic acid. Cotton seed, containing a high temperature of linoleic acid but no linolenic acid is a typical semidrying oil; and olive oil, which contains no linolenic acid and only a small amount of linoleic acid is generally classed as a nondrying oil. And it is well recognized that certain temperatures and conditions will cause a fire in rags wet with linseed oil or other drying liquid when it would not do so in rags wet with olive oil. The danger from olive oil is less because a higher temperature is necessary to materially increase its rate of oxidation. But it is abundantly established by the testimony that given the right conditions of temperature, time, insulation, supply of oxygen, character of rags, amount of olive oil present, ignition will occur in rags impregnated with olive oil.
All the experts agree that raising the temperature increases the rate of oxidation and that at certain temperatures rags impregnated with olive oil will ignite from spontaneous combustion if all other conditions be ripe for it, and that the higher the temperature the less the time required for it *730 to occur. Oxidation, like evaporation, increases with the amount of exposed surface. In a cup of oil the rate of evaporation and oxidation is comparatively very slow. On the other hand, if the oil is spread out upon a surface the rate of oxidation increases but the heat generated is rapidly dissipated and there is little danger of ignition. One of the most important factors in spontaneous combustion is the amount of insulation present. So that if spontaneous combustion is to occur in a bale of rags, the rags must be saturated with olive oil to a point far enough inside the bale to prevent heat that is generated from being dissipated into the air and near enough to the surface of the bale and the air to have an adequate supply of oxygen. Just where this point in one of these bales of rags is located is unknown as it obviously depends upon many uncertain factors. But the consensus of opinion of the witnesses is that this point in a bale of rags is located somewhere about halfway between the center of the bale and the surfaceat least several inches in from the surface. They also agree that if the oil saturated point was nearer the surface a higher temperature would have to be maintained to produce ignition, and that a temperature which would cause ignition in a large bale of rags impregnated with olive oil would not produce ignition in one or a few loose rags impregnated with the oil because the heat generated passes away freely into the surrounding air.
A number of elaborate tests have been conducted by the respective experts for the purpose of ascertaining the temperature and conditions necessary to produce spontaneous combustion in a bale of rags and loose rags impregnated with olive oil; also the time required at various temperatures, but there is a sharp difference of opinion among them as to the conditions under which the tests were made and what the tests show or do not show, and how the conditions of the tests compared with those on the Cabo Hatteras. The results of those tests were not convincing proof of the accuracy of the theories which they purported to demonstrate, all of the tests being attacked by the opposing expertsand properly it seemed to meon the ground that the heat was so applied as to cause direct or local heating, or that the insulation and supply of oxygen was inadequate or excessive as the case might be. One group of witnesses testified that under the conditions present on the Cabo Hatteras it was impossible that the fire could have been due to it. The other group were equally positive that the fire could have been due to spontaneous combustion and was in their opinion due to spontaneous combustion in the oil impregnating the rags.
The testimony of several chemists as to what temperature rags saturated with olive oil must be subjected to to produce ignition from spontaneous combustion varies between 90 degrees and 170 degrees Fahrenheit, though at 90 degrees it was admitted it would require many days. But it has been affirmatively established that loose rags saturated with olive oil will ignite from spontaneous combustion within a day or two if subjected to a sufficiently high temperature and all other conditions are right for it. However, there is a wide divergence in the opinion expressed by the several experts during the trial and also among text-book writers on the subject as to the temperatures and precise conditions necessary to produce it. My conclusion, after full consideration of all the testimony and evidence submitted, is that it has not been shown by convincing proof that a temperature of less than somewhere between 140 and 150 degrees would be sufficient to produce ignition in loose rags saturated with olive oil within a day or two, although if the period of time be extended to a number of days, a somewhat lower temperature would suffice. Also that an entire bale of rags impregnated with the oil will ignite at a lower temperature than a few loose rags wet with the oil.
There is a tradition that wet or oily rags are dangerous because of their being liable to spontaneous combustion and many of the standard books on stowage refer to this. The Regulations of the United States Interstate Commerce Commission forbid a carrier from accepting them for transportation. This is a general rule and includes rags wet with any liquid or oil, notwithstanding that castor oil is practically free from danger of spontaneous combustion and nondrying oils are not regarded by chemists as liable to produce spontaneous combustion under normal conditions, but such a rule undoubtedly is a wise one for it would be impractical, if not impossible, for a carrier to ascertain just what was the particular oil on the rags tendered for shipment.
The contention of the libelants is that either an entire bale of rags became impregnated with the olive oil in which event ignition would have occurred within a week if subjected to a temperature of 100 degrees, or that some loose rags became impregnated with the oil and if subjected to a temperature of 130 degrees would ignite within twenty-four *731 hours, and they contend that even higher temperatures than these existed in the bridge deck compartment.
Without passing on the soundness of the first proposition, but merely assuming it to be so for present purposes, I think it is clear that the idea that the fire was caused by an entire bale having become impregnated with olive oil must be eliminated. For the testimony is that it takes ten to fifteen gallons of oil and some time to do this. And not only is there no proof that any bale was so saturated, but from the conditions discussed further on it seems highly improbable if not impossible that any of the bales could have been.
To support the theory that either an entire bale of rags or some few loose rags in the bales became saturated with olive oil, it is essential to show that there was more or less of a substantial leakage of olive oil from the drums. There is no direct proof of it but it is urged by libelants "that a certain amount of leakage was to be expected under normal conditions; in heavy weather it was practically certain that the leakage would be substantial."
After examining the type of iron drum which contained the olive oil in the bridge deck space and listening to the testimony, I am fully convinced that the normal leakage from such drums is small and generally of slight consequence. Cargo interests may hesitate somewhat to prove that the drums were not sound, but I think that it appears from respondents' witnesses' testimony that the drums were in good condition when loaded. There was some criticism of stowing the drums on end instead of on their sides, but the best practice seems to be to stow iron drums on end when only one tier is to be carried. So stowed they are less likely to roll with the vessel for the iron rim on the head of the drums "bites" into the dunnage boards or planks upon which they rest and tends to keep them from moving.
Referring now particularly to the method used in stowing the drums and bales and in dunnaging them rather than to their location. After hearing this discussed by a number of witnesses of long experience some as stevedores, others at sea on cargo carrying vessels, I believe that it was done in a manner customarily followed to prevent displacement or damage from the rolling of the vessel and which had generally proven to be effective. Of course, if the stowage in the bridge deck compartment was badly broken by the rolling of the vessel in the storm, it is likely that some of the drums would become damaged and leak. On occasions drums containing olive oil or other liquids on a vessel have been damaged in a severe storm and caused leakage. No one has testified that he observed the condition of the stowage in the bridge deck compartment after the vessel sailed, except the boatswain who entered the hatch when the fire was discovered and who said that he saw no evidence of a collapse of stowage. Many witnesses have given their opinions as to the effect the storm would have on the stowage, one group stating that the stowage would shift and the drums would be damaged and caused to leak; another group testifying that if stowed and well chocked up with dunnage the heavy drums and bales would not move or become damaged. Some heavy weather is quite usually encountered upon a winter transatlantic voyage, but with proper stowage it is the exception rather than the rule for cargo to be discharged damaged as a result of break-up of stowage, and, if it remains intact, cargo is ordinarily not damaged. To support the opinion that the drums on this voyage could have been damaged in the storm preceding the fire, libelants refer to the previous voyage of the Cabo Hatteras when drums of olive oil were damaged during an equally severe storm and did leak. It appears that on her previous voyage in December, the Cabo Hatteras also encountered a hurricane and heavy weather and that thirteen drums of olive oil were delivered to the consignees slack out of shipment of two hundred drums made up of three lots. Of the thirteen drums which were delivered slack, ten of them were part of a lot which had been stowed on the forward well deck and her master testified"In the hurricane the seas were shipped on board and they broke the stowage and they knocked one against the other and were broken." But three drums which had been carried below deck were slackone of a lot of fifty drums weighed only 366 pounds when delivered; in another lot of fifty-one drums one weighed 345 pounds, and the other 75 pounds. It appears from the bills of lading that these drums of olive oil weighed, when shipped, between 430 and 440 pounds. While there is no direct evidence that any of this loss occurred on the vessel, or that it was not due to handling during or after the discharge, I think the clear indications are that it took place on shipboard except possibly the loss from the drum weighing 75 pounds. There were four other lots of drums of olive oil carried on the same voyage, but it does not appear whether or not there was a loss in *732 any of them. This, of course, does show that there is a possibility of damage to the drum under certain conditions and there is much testimony to the effect that there is a shortage or leakage of olive oil on occasions and that most instances of leakage were caused by the handling of discharging or loading. But if it be assumed that there was some leakage on this last voyage of the Cabo Hatteras, and there is certainly nothing more than a probability of this, the amount of oil which escaped is a matter of pure conjecture or speculation.
A very considerable amount of oil would have to leak before it would be likely to rise above the dunnage and reach the bales of rags, for underneath the drums and between the deck and the bales were two layers of dunnage boards or planks raising the drums and bales two to three inches above the deck. The normal bale of rags is a hard hydraulically compressed mass with flat sides bound together with steel bands or wires and it could bulge down only to a very slight extent, if any, into the narrow spaces between the dunnage boards or planks if the bale remained intact; one layer of the dunnage was laid athwartship and the other laid fore and aft. One of the purposes of dunnage is to keep baled goods clear of the deck. Unless there was a sudden collapse of a drum and there is no evidence that this occurred, or there was a substantial leak from a number of drums adjacent to each other, it would seem that the natural course of the oil would be to run off through the dunnage underneath the drums down to the scuppers into the bilges as the sides were twelve inches lower than the center line of the deck. The vessel was trimmed aft so that she was down by the stern. There was a difference in level of three inches between the forward and after ends of the bridge deck compartment (about 100 feet) so that the slope of the deck from the center to the side was much greater than toward the after end of the vessel. Any oil on the deck would therefore tend to flow to the side of the vessel and then aft. There was a set of drainage pipes or scuppers leading from the bridge deck space down to the bilges; one set on each side of the vessel. They were located respectively in the outboard corners just forward of the coal bunkers and in the corner of the after end of the compartment. The rolling of the vessel might have some temporary effect on the course of the flow of any oil, but probably the net result would be to average it so that it flows along in its normal course unless a large quantity of oil suddenly escaped from the drums, in which event it would tend to slosh around. The circumstances cast serious doubt upon the assumption that a substantial amount of oil escaped from the drums or certainly any substantial amount during any one day, for the bilges were sounded daily, including the morning of the fire, and no trace of olive oil was found. The ship's carpenter testified that before lowering his sounding rod into the bilges he put chalk upon it so when there is any oil in the bilges it sticks to the rod and can be seen. If it is to be assumed that a substantial amount of oil leaked from the drums enough to penetrate up and by absorption saturate even one bale, sounding the bilges would have indicated it for there was no other place for the oil that was not absorbed by the bales to go except into the bilges, and it is not probable that all would be so absorbed as absorption is a slow process. If there was enough oil on the deck to slosh around and wet the bales, by far the greater portion of it would have drained down into the bilges and any such quantity undoubtedly would have been apparent when sounding the bilges. If only a small amount of oil gradually leaked from the drums, it naturally would have trickled through the spaces in the dunnage and across the deck and not reached the bales with the two layers of dunnage between them and the deck. It may have been that some bale had loose rags sticking out which came in contact with the deck just when the oil happened to flow across it, but if the bales were in normally good condition, this would not be likely for the bales were pressed into a hard mass with flat surfaces, and it would seem to be indulging in a series of conjectures to say that just this did occur. Further, there is no evidence that the bales were not in good condition. The bills of lading are to the contrary.
However, if it be assumed that some loose rags in the bales did become impregnated with the olive oil, the next important question iswere they subjected to a sufficiently high temperature to produce ignition? And from all the evidence, I find that a temperature of around 140 degrees would be necessary and under the conditions that existed would probably require several days.
Libelants do not claim that any such temperature as 140 degrees was to be found throughout the bridge deck compartment, but they do contend that in the vicinity of the deck plates alongside the engine room casing a temperature considerably higher than 140 degrees existed.
Underneath the bridge deck compartment *733 were hanging coal bunkers which extended from her sides to within 2½ feet of her engine room casing. This results in there being a narrow strip of the deck plate on the port and on the starboard side of the engine room casing beyond the point to which the hanging coal bunkers underneath extend and protect it from the heat of the fire and boiler rooms below. This strip is considerably warmer than any other part of the deck in the compartment. It is 2½ feet wide and 16 feet long but the forward end of it for a distance of 6 feet and 3 inches is protected by a hanging screen or bulkhead below. Many vessels are similar to the Cabo Hatteras in this respect. Others have no coal bunkers underneath the bridge deck so that their bridge deck compartments are more exposed to the heat from the fire and engine rooms than that of the Cabo Hatteras. Six inches of the width of the strip are taken up by the permanent wooden battens surrounding the steel engine room casing and the air space between them.
There is no definite evidence of the temperature of this strip of the deck plate, merely opinions based upon tests and observations in other vessels. Mr. Robert Haight, a marine engineer, after making observations on other vessels for this purpose, has testified that in his opinion the temperature of this small section of the deck plate would not be more than 122 degrees with a temperature of 85 degrees to 87 degrees at the bottom of the bales  2 to 3 inches above the deck on dunnage  with the air circulating through the dunnage, and with the engine room casing protected by battens and providing a space of 6 inches between the casing and cargo. Witnesses called by the libelants have estimated the temperature of this section of the deck plate at 170 degrees and over. But after seeing them all and hearing them discuss the various factors which they took into consideration in forming their estimate, I think the evidence indicates a temperature of this section of the deck plate itself adjacent to the uptake and funnel (the warmest point) of somewhere between 122 and 140 degrees, and that the temperature at this point just above the dunnage was between 90 and 100 degrees. While these temperatures existed at or above this particular narrow strip of the deck plate, this heat was rapidly dissipated in the compartment; the general temperature of the compartment was in the neighborhood of 70 to 75 degrees. The average temperature of the outside air during the voyage was 63 degrees and on the day of the fire was 44 degrees, and I find the Cabo Hatteras had the usual amount of ventilation in this compartment for vessels of her type with the samson post ventilators and the doors at the after end of the compartment partly open. Several witnesses of long experience at sea upon steamships, who apparently were disinterested and who impressed me as reliable, testified that under ordinary conditions there was a difference of 10 to 15 degrees between the temperature of the bridge deck compartment and the outside air and that in their opinion this would have been about the difference on the Cabo Hatteras. The bridge deck compartments of many vessels have no protection from bunkers underneath them, which tends to make their bridge deck compartments warmer than that of the Cabo Hatteras, and all kinds of general cargo, including onions, fruits, cotton, waste wool, burlap, etc., are customarily stowed in them. And quite frequently on long voyages bunker coal is carried in such space and this is peculiarly subject to spontaneous combustion, and coal is usually stowed directly on the deck without dunnage. It is undoubtedly true, as one witness said, that all 'tween spaces in a ship on a Mediterranean voyage are "much warmer in summer time than the bridge deck space would be in winter."
To know where the fire originated is important as it might be helpful in determining how it originated. There is no evidence that it started in the bales of rags stowed over this 2 foot strip along the engine room casing. The only testimony is that when it was discovered it was "around the samson post" and this is somewhat confirmed by the fact that the bulkhead of the temporary coal bunker "was smoking and on fire" at the point where the bunker hatch was. This bunker hatch comes within 2 feet of the samson post. The samson post is forward and to the port of this strip or "shelf," and about 12 feet from the warmest part of it, which is alongside the uptake and the funnel which is 4 feet and 9 inches inside the casing. The samson post is about 6 feet distant from the "shelf" itself, but the forward end of the "shelf" for a distance of 6 feet and 3 inches is protected by a hanging screen or bulkhead below, which would materially reduce the temperature of that part of it. And while 12 feet is not a great distance, the temperature around the samson post would be very considerably lower because of its nearness to the ventilator and outside air.
In view of all the testimony respecting spontaneous combustion and the conditions *734 so far as they are known, I am not convinced that the temperature was sufficiently high in this area around the samson post to produce ignition from spontaneous combustion, at least, within the period of time it might be assumed that the storm had caused a collapse of the stowage and a material leakage of oil. I think it unlikely that the temperature within this area exceeded 75 or 80 degrees although nearer the engine room casing it would be somewhat higher. But with the high winds there would be a strong flow of outside air through the ventilators and openings tending to dissipate the heat rapidly.
I fully realize that witnesses called by libelants have testified that in their opinion the temperatures on the deck plates alongside of the engine room casing and throughout the bridge deck compartment would be very much above those which I have found probable. But the conditions in the bridge deck compartment of the Cabo Hatteras were not unique. There were many vessels of her type and the Hog Island ships with the full width of their decks directly over the boiler without the protection of the coal bunkers underneath must be warmer, and yet these vessels regularly carry in their bridge deck compartments perishable cargo, including various kinds of oils, coal, fruit, onions, etc., as it appears the Cabo Hatteras has been doing for several years, and if the temperature claimed by libelants existed such, I think, would not have been the case. She was constructed under the supervision of Lloyds Register and regularly inspected by its representatives. To sustain a finding that the cause of the fire was spontaneous combustion, the following facts or chain of events must be proven by direct or circumstantial evidence:
(1) That there was sufficient leakage of oil to impregnate a portion of one or more bales or loose rags; (2) that this oil did not drain off into the scuppers on the lower side of the vessel and did flow over this particular small section adjacent the engine room casing; (3) that one or more bales penetrated through the narrow openings in the dunnage and rested on this portion of the deck adjacent to the casing, or that loose rags came in contact with the deck at this point, or that there was so much loose oil on the deck that reached the bottom of a bale at this particular spot; (4) that the temperature of the rags or bales of rags which became impregnated with oil was sufficiently high to cause ignition; and (5) that these events all occurred sufficiently in advance of the fire to produce ignition by spontaneous combustion.
Unless these facts are established, it seems clear the libelants have not sustained their burden of showing the cause of the fire and that it was spontaneous combustion. They have not been proven, and may not be left to conjecture.
Confirming the conclusion that there is a lack of proof that the fire on the Cabo Hatteras was due to spontaneous combustion as a result of the rags having become impregnated with the olive oil, is the fact urged by the libelants, for the purpose of imputing knowledge to the respondents, that the stowing of rags and olive oil together in the bridge deck compartments of their steamers was and had been a practice of many years standing. That this practice existed is not denied by respondents. On the contrary, it is urged by them in support of their contention that the cargo on this voyage of the Cabo Hatteras was properly stowed, for no such fire had ever occurred on any of its vessels before.
Many witnesses, including cargo surveyors, stevedores, ship officers, and others, have testified as to whether or not there was "common knowledge" of danger of spontaneous combustion in stowing olive oil and rags, cotton or rags, etc., in the same compartment, one group of witnesses holding that it was; the other group holding to the contrary. A number of stowage plans of vessels engaged in the Mediterranean trade were introduced upon the trial showing that olive oil and rags or cotton, or similar materials, frequently were carried in the same compartment and sometimes in the bridge deck compartment.
While it appears that oily or wet rags, cotton, etc., are not accepted by carriers because of the general fear of spontaneous combustion, it also appears that it is not unusual to stow olive oil either in cases or drums in the same compartment with rags, cotton, or similar materials if each is properly dunnaged.
Just what "common knowledge" the owners of the Cabo Hatteras and those who loaded her in Spain might or should have of the danger under ordinary conditions of spontaneous combustion if the olive oil and bales of rags are stowed in the same compartment, is problematical in light of the sharp differences of opinion of the highly qualified chemists after conducting many laboratory tests to determine whether it would occur at all, and, if so, under what *735 conditions. The question of common knowledge of a danger is to be decided from the standpoint of the knowledge, experience, and judgment of competent persons engaged at that time in loading cargos in the port in Spain from whence the Cabo Hatteras sailed. The Titania (D. C.) 19 F. 101; The Indrapura (C. C. A.) 190 F. 711.
Other facts for consideration in relation to contention that the combination of olive oil and bales of rags in the same bridge deck compartment was commonly known to be dangerous because of the liability to spontaneous combustion, are that according to the records of the United States Department of Commerce an average of about 350,000 drums of olive oil and some 600,000 bales of rags are or were imported into this country prior to 1929. And there is no proof by the libelants of any fire from spontaneous combustion as a result of this practice. Of course, we do not know where or how they were stowed except in the instances previously referred to, but it would seem reasonable to presume that, if spontaneous combustion occurred and would occur when olive oil and rags came in contact under conditions which cargo was subjected to on shipboard, that it would be a settled fact with convincing proof of it. The chemists called by the libelants had never heard of a fire being caused by spontaneous combustion of olive oil on rags outside of their own laboratories, and the records of the New York fire department contain no record of any such fire. It is true that libelants called some witnesses who attempted to testify that they had seen or heard of fires due to spontaneous combustion of olive oil on rags, but after hearing their testimony it became very evident that it was unreliable and inconsistent with reports made at the time and contrary to the apparent facts or that their conclusions were open to serious question.
In International Mercantile Marine S. S. Co. v. W. & A. Fletcher, 296 F. 855, 858, cited by libelants, Judge Hough, for the Circuit Court of Appeals of this Circuit, said:
"Liability is measured by the known dangers to be guarded against, and if care according to the circumstances is wanting, the natural inference is that injury accrues from the known dangerit is caused by the lack of care. The blowtorch near remover and waste was negligence, the danger of fire was well known, and we find adequate cause proximately existing in that negligence for the ensuing loss. The Strathdon (D. C.) 89 F. 374; Brown v. Standard, etc., Co., 159 C. C. A. 397, 247 F. 303."
However, as is indicated in the portion quoted from Judge Hough's opinion, that was a case where a workman was using a blowtorch close to highly inflammable varnish remover composed of alcohol, benzol, and wax. There had been two earlier fires on the same day caused in the same manner, and the court held that it was negligence to use a blowtorch in proximity with so much inflammable material. The workman continued to use the blowtorch under the same conditions and a third fire, the one causing the damage, occurred. The court found that the only reasonable inference was that the negligent use of the blowtorch caused it. The inference in International Mercantile Marine S. S. Co. v. Fletcher, supra, was clear, but the circumstances there were quite different from those in the case at bar where several essential facts necessary to base a conclusion upon are left to conjecture, and inference must be based upon inference. For assuming that there existed on the deck plates along the engine room casing on the Cabo Hatteras sufficient temperature to be an effective agency to produce spontaneous combustion under certain conditions if rags saturated with olive oil were exposed to it long enough, it is but speculation to say that this could or might have happened. It does not seem to me that the facts justify an inference of causal relation. In order to prove a fact by circumstances there should be positive proof of the facts from which the inference or conclusion is to be drawn. The circumstances themselves must be shown and not left to rest in conjecture, and when shown it must appear that the inference sought is the only one which can fairly and reasonably be drawn from these facts. People v. Harris, 136 N. Y. 423, 33 N. E. 65.
It is also true that in International Mercantile Marine S. S. Co. v. Fletcher, supra, the respondent was liable for any negligence of its employees.
The libelants urge that her owners are precluded from claiming exemption under the American fire statute (section 4282 R. S. [46 USCA § 182]) because the bridge deck compartment of the Cabo Hatteras was not equipped with steam smothering lines in the bridge deck compartment as a precaution against fire. She was equipped with the usual lines of fire hose and these were immediately used to pump water from the sea upon the fire until the fire got too hot to use them. It is conceded that the Cabo Hatteras complied with the requirements of the Spanish law and also with Lloyds. Her classification by Lloyds was +100 A  1  the highest. *736 Many foreign vessels are not equipped with fire smothering apparatus and the evidence is that a large part of those which are so equipped do not have it in the bridge deck compartment. Section Rev. St. § 4470, as amended (U. S. C. title 46, § 463 [46 USCA § 463]), relating to steam smothering lines does not apply to the Cabo Hatteras, a Spanish cargo vessel, in view of Rev. St. § 4400 as amended (U. S. C. title 46, § 362 [46 USCA § 362]).
In The Princess Sophia (C. C. A.) 61 F. (2d) 339, at page 347, a Canadian steamer was destroyed by stranding. She complied with all the Canadian laws in regard to equipment, but not with American requirements, which differed in some respects, and her right to limit was challenged, and the court (C. C. A. 9th) stated that reciprocity of inspection laws existed between Canada and the United States (as between Spain and the United States in the case at bar) and said:
"As to Canadian law, however, this point is not material, since we do not find that there was any violation of the Canadian law as to equipment or manning, which could have contributed to the disaster.
"But it is seriously urged by the appellants that the Sophia violated a number of provisions of American law as to life-saving appliances, including line-carrying projectiles, lifeboats, and life-saving gear, as well as to the manning of the lifeboats, strength of davits, condition of the radio service, and the sufficiency of the crew in general. The facts as to these particulars become immaterial if we find that the Princess Sophia was not subject to the life-saving requirements laid down by American statutes."
The Cabo Hatteras was an ordinary cargo vessel of quite usual type and her construction and her reconstruction and her equipment in 1924 were under the supervision and approval of Lloyds Register of Shipping and up to the time of her loss she was rated by the Lloyds in its highest classification. She met the requirements of all laws applicable to her. Neither the Spanish law nor Lloyds required her to have steam smothering lines in her bridge deck compartment. She must be in good condition and reasonably safe and efficient for the service in which she is engaged. The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241.
"There are, however, degrees of safety; and she need not be the safest. A new vessel, of the highest order of construction, is safer than one several years old, and of a lower order of workmanship. Yet the latter may be, and, if in good condition, is, seaworthy." The Marlborough (D. C.) 47 F. 667, 670.
A vessel owner is not bound to equip her with every known safety device nor to adopt all the latest improvements under peril of his ship being held unseaworthy. Latest improvements or not  the question is one of reasonable fitness for the undertaking. McCaldin v. Cargo of Lumber (D. C.) 198 F. 328, affirmed (C. C. A.) 202 F. 735; Brick v. Long Island R. R. Co., 245 N. Y. 222, 157 N. E. 93; Bradley v. Federal Steam Navigation Co., 24 Lloyds List Law Reports 446.
The conditions described by those who first observed the fire indicate that it then had already made such headway that lines of steam smothering apparatus would have had little effect and this is confirmed by the testimony of several who were present. The fact that there was no steam line in the bridge deck compartment is not, in my opinion, sufficient to charge the owners with neglect under R. S. § 4282 (46 USCA § 182).
That the statute was not specifically incorporated in the bill of lading does not deprive the owners of the vessel of the right to avail themselves of the protection of R. S. § 4282. The Titanic, 233 U. S. 718, 34 S. Ct. 754, 58 L. Ed. 1171, L. R. A. 1916B, 637; The Strathdon (D. C.) 89 F. 374; Id. (D. C.) 94 F. 206, affirmed (C. C. A.) 101 F. 600; The Norge (D. C.) 156 F. 845.
There were many possible causes of the fire and as was said by the Circuit Court of Appeals in The Strathdon, supra, at page 606 of 101 F.: "The occult causes of fire are as numerous as they are mysterious."
After what I believe is a careful consideration of all the evidence presented by able and diligent counsel, my conclusion is that the proof does not show that the fire on the Cabo Hatteras was caused by the "design or neglect" of her owners. Accordingly the libels are dismissed.
If the foregoing be deemed insufficient compliance with Admiralty Rule 46½ (28 U. S. C. § 723 [28 USCA § 723]), findings and conclusions may be settled on notice.